IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GRANT HEILMAN PHOTOGRAPHY, INC. : | CIVIL ACTION |
| : | |
| Plaintiff, : | |
| v. : | |
| : | |
| THE MCGRAW-HILL COMPANIES, INC., and : | NO. 12-2061 |
| JOHN DOES PRINTERS 1-10, : | |
| : | |
| Defendants : | |

**MEMORANDUM RE: DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Baylson, J.                                                                                          November 27, 2012

**I.       INTRODUCTION**

Plaintiff, Grant Heilman Photography, Inc. ("GHPI") is a stock photo agency that licensed thousands of photographs to Defendant, The McGraw-Hill Companies ("McGraw"), between the years 1995 and 2011.  Plaintiff filed a Complaint on April 18, 2012 alleging that McGraw committed numerous discrete acts of copyright infringement by exceeding the terms of GHPI's licenses on over 2,000 photographs.  (ECF No. 1).

Currently before the Court is McGraw's Motion for Partial Summary Judgment on statute of limitations grounds.  (ECF No. 12).  McGraw contends that GHPI was given constructive notice of copyright infringement as early as August 2006 when McGraw notified GHPI that it had exceeded the terms of 16 licenses.  Under the "discovery rule," McGraw argues that it is entitled to partial summary judgment for any infringing act that occurred prior to the three-year period preceding GHPI's filing of the Complaint.  As discussed, however, a genuine dispute of material fact exists about whether and when GHPI should have discovered the alleged infringements that McGraw never disclosed.  Accordingly, McGraw's motion will be DENIED.

1

## II.  RELEVANT FACTS

GHPI and McGraw had a long course of dealing.  From 1995 through 2011, McGraw purchased licenses for 2,395 of GHPI's photographs for use in its educational textbooks.  GHPI's licenses are "expressly limited by number of copies, geographic distribution area, language, duration, and/or media."  Declaration of Sonia Wasco ("Wasco Decl.") ¶ 10.  If the licensee wishes to exceed the terms of a license, it must purchase "additional rights" from GHPI which GHPI sells at a discounted rate.  As stated on GHPI's invoices, a licensee who exceeds the terms of a license prior to purchasing additional rights is deemed to have committed an act of copyright infringement and owes "liquidated damages . . . equal to ten (10) times the maximum price [GHPI] would have charged."  Id. ¶ 11.  If the licensee pays these damages, GHPI foregoes "its right to sue for copyright infringement."  Id.

### A.   *Asserted "Storm Warning" #1—August 2006*

On August 16, 2006, GHPI received an unsolicited check from McGraw for $39,433.10.  Id. ¶ 18.  Included with the check was a letter from McGraw's Heidi Kidwell that read:

> "Enclosed please find payment under our photo license agreement for usage in a print run larger than originally anticipated. The [16] invoices for which payment is adjusted are . . . .  This reflects additional success for our works and we appreciate your role in contributing to that success."  Wasco Decl. Ex. 3.

After receiving this letter, GHPI's Carroll Forry emailed Kidwell for clarification on how McGraw calculated the amount it owed.  Id.  Kidwell responded by specifying how far McGraw had exceeded the 250,000 copy limit for each of the 16 licenses.  Id.  Based on Kidwell's response, GHPI's President (Sonia Wasco) sent Kidwell a letter (on October 3, 2006) explaining that additional fees were owed, which McGraw promptly paid.  Wasco Decl. Ex. 5.

Unbeknownst to GHPI at this time, McGraw sent virtually identical, unsolicited letters to dozens of other stock photo companies and photographers from which it had obtained licenses.

2

GHPI has produced affidavits from 7 of these companies/photographers, each of whom asserts that—as with GHPI—they perceived McGraw's voluntary disclosure as evidence of an isolated occurrence, not evidence of systemic infringement.  Pl's Mem. Exs. D-J.  Further, as with GHPI's President, the seven affiants assert that it would not have been "economically feasible" for them to have monitored McGraw's use of all their licenses as doing so would require "hir[ing] a staff of investigators that would outnumber the licensing staff" and "would strain the relationship between the agency and licensees, most of whom are repeat customers."  See, e.g., Pl's Mem. Ex. E, ¶ 14.  The record shows, for example, that most of the information GHPI would have needed to determine if McGraw had exceeded the terms of its other licenses (e.g., how many copies of each textbook were published *and when*), was in McGraw's sole possession.  See Wasco Decl. ¶ 13 & Ex. 4, 7, 8.  Although McGraw provided GHPI the print run information for three licenses in 2009 when GHPI asked for this information, it did so only after weeks of repeated requests by GHPI.  Wasco Decl. Exs. 7 & 8.  McGraw argues that its disclosure of the print-run information for these three licenses highlights that GHPI could have discovered its injuries had it simply asked.[1]  GHPI responds by pointing out that when it later

---

[1] McGraw also points to declarations made by GHPI's president, Sonia Wasco, and a private investigator, Michael Harmon, in Viesti Associates, Inc. v. The McGraw-Hill Companies, Inc., No. 11-cv-01237 (D Colo)).  Declaration of Christopher P. Beall ("Beall Decl.") Exs. 1 & 2.  In Wasco's declaration, she states that when McGraw provided print run information to GHPI in 2009, it did not require GHPI to keep the information secret "or indicate the information was confidential in any way." Id. Ex. 1. ¶ 5.  In Harmon's declaration, he states that "[a]ll of the publishers with whom I communicated, including McGraw-Hill, John Wiley & Sons, Perason, Benchmark, Houghton Miffin, Little Brown, Random House, and others, made unconditional print run disclosures to me for numerous textbooks." Id. Ex. 2. ¶ 3.  McGraw cites these assertions as evidence of its willingness to provide license usage information when asked.  GHPI responds by noting that McGraw "omitted the exhibit to Mr. Harmon's declaration, which catalogued his inquires to McGraw about specific publications . . . [which] demonstrates Mr. Harmon often had to make numerous inquiries and contacts with McGraw before it begrudgingly disclosed usage information."  Pl's Mem. at 19 n.95.  Further, with respect to Wasco's declaration, GHPI notes that "whether McGraw disclosed its print quantity information *without requiring that it be kept secret*" is irrelevant to "whether McGraw freely disclosed print quantity information every time it was asked." Id. at 18.

3

became suspicious of systemic infringement, McGraw refused its request for information on how McGraw had used the 2,395 licensed photographs.

B.     Asserted "Storm Warning" #2—September 2007

On September 16, 2007, a photo research firm working on behalf of McGraw (Feldman & Associates) wrote to GHPI requesting "license and invoicing adjustments . . . to accommodate variances in final image usage" for the textbook *MMH Science 2008 PE – Grade 5*.  Earlier that year (on January 17, 2007), GHPI had granted a license to McGraw to include two photographs in this textbook.  Since GHPI believed the textbook had a publication date of 2008, GHPI claims it "did not view this letter as a notification of any copyright infringement by McGraw," but instead as a prospective request for additional rights.  Wasco Decl. ¶ 31-32.  McGraw challenges the credibility of this assertion by pointing out that a simple online search of the textbook's ISBN shows that it had a publication date of January 30, 2007.  McGraw's Resp. to GHPI's Stmt. of Add'l Material Facts ¶ 60.  McGraw states, therefore, that "any mistaken belief by GHPI concerning the publication status of the book is contradicted by the publicly available, and easily ascertainable, date of publication."  Id.

On April 18, 2012, GHPI initiated this action by filing a Complaint against both McGraw and John Doe Printers 1-10.  (ECF No. 1).  On July 30, 2012, McGraw filed an Answer in which it asserted the statute of limitations as an affirmative defense.  (ECF No. 5).  On August 31, 2012, and prior to the commencement of discovery, McGraw filed a Motion for Partial Summary Judgment pursuant to Federal Rule of Civil Procedure 56(a) as well as a Motion to Stay Discovery.  (ECF Nos. 12 & 13).  At oral argument on September 24, 2012, the parties agreed to stay discovery pending resolution of the Defendant's motion.  (ECF No. 22).  The Court noted

4

this agreement in an October 3, 2012 order that laid out ground rules for handling future discovery disputes based on assertions of confidentiality. (ECF No. 23).

### III. LEGAL BACKGROUND[2]

#### A. *Summary Judgment*

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id. Under Rule 56, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in favor of the non-movant. Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).

#### B. *The Copyright Act's Statute of Limitations*

The Copyright Act provides that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). Under the "discovery rule," a claim under the Copyright Act does not accrue until "the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim." William A. Graham Co. v. Haughey, 568 F.3d 425, 438 (3d Cir. 2009) (internal quotation mark omitted). In determining whether GHPI should have discovered its injury, we must look to whether GHPI had "sufficient information of possible wrongdoing to place [it] on inquiry notice or to excite storm warnings of culpable activity." Id.; see also Wanlass v. Gen. Elec. Co., 148 F.3d 1334, 1338 (Fed. Cir. 1998) (stating that, in patent cases,

---

[2] The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1338. Venue in this District is proper pursuant to 28 U.S.C. §§ 1391(a), (b) and 28 U.S.C. § 1400(a).

inquiry notice exists when the infringing activity is "pervasive, open, and notorious"). The test for storm warnings is "objective," based on what a reasonable person in the plaintiff's position would have perceived. See Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital, 435 F.3d 396, 400 (3d Cir. 2006). McGraw bears "a heavy burden" of demonstrating constructive notice as a matter of law because "the applicability of the statute of limitations usually implicates factual questions as to when plaintiff discovered or should have discovered" the injury. See Matthews v. Kidder, Peabody & Co., Inc., 260 F.3d 239, 250 (3d Cir. 2001). Even if McGraw can meet this burden, GHPI can defeat summary judgment if it can demonstrate that it "exercised reasonable due diligence and yet [was] unable to discover its injuries." Id. (alteration in original).

## IV.   THE PARTIES' ARGUMENTS

McGraw argues that the August 2006 and September 2007 incidents imposed a duty on GHPI to determine if McGraw was exceeding the terms of any other license that GHPI had issued. Def's Mem. at 9. According to McGraw, "[a] photo agency with the kind of information that McGraw-Hill provided to GHPI in 2006 and 2007 is duty-bound, as a matter of law, to monitor its licensee's use of the agency's photos, so as to ensure compliance with any of the agency's license restrictions." Id. In support of this position, McGraw cites several district court decisions (discussed in depth below) where the injured party's discovery of copyright infringement was deemed to place the party on notice that the bad actor might be infringing other copyrights. Id. at 10 (citing Luar Music Corp. v. Universal Music Group, Inc., 847 F. Supp. 2d 299, 309 (D.P.R. 2012); Fahmy v. Jay-Z, 835 F. Supp. 2d 783, 790 (C.D. Cal. 2011); Weber v. Geffen Records, Inc. 63 F. Supp. 2d 458, 465 (S.D.N.Y. 1999); Kepner-Tregoe, Inc. v. Exec. Dev., Inc., 79 F. Supp. 2d 474, 488 (D.N.J. 1999)).

GHPI counters by arguing that it reasonably perceived McGraw's voluntary disclosures as the acts of an honest business partner, thus fostering trust in McGraw's good faith rather than cynicism. Pl's Resp. at 8-9. GHPI also argues that it is premature to determine whether it could have been on inquiry notice, because the record does not yet indicate when the alleged infringements took place. Id. at 5-7. To support this latter argument, GHPI points out that, under Graham, the "*first step* in applying the discovery rule . . . is to establish when the injurious . . . act defined by the statute occurred." 538 F.3d at 438 (emphasis added). Since this first step cannot yet be conducted, GHPI argues that a ruling on inquiry notice would constitute an advisory opinion—a position that it supports by referencing a brief, one page opinion from the Southern District of New York. Pl's Resp. at 7 (citing Muench v. Houghton Mifflin Harcourt Pub. Co., Inc., No. 09-2669, 2010 WL 8531498 (S.D.N.Y. Oct. 14, 2010).

McGraw responds that knowledge of the dates of the alleged infringements is unnecessary at this juncture because, *inter alia*, a motion for partial summary judgment can be appropriately granted to narrow the relevant issues for discovery. Def's Reply Mem. at 6-7. Since over 2,300 separate acts of infringement are being alleged, McGraw contends that "[i]t makes no sense to wait to resolve the issue of the timeframe implicated by this lawsuit until after the parties have engaged in the costly discovery necessary to identify the dates of any possible infringements." Id. at 7.

**V.     ANALYSIS**

*A.     Reaching Merits of Defendant's Motion Would Not Be an Advisory Opinion*

As an initial matter, the Court rejects Plaintiff's argument that lack of specific information on the dates of the alleged infringements precludes this Court from determining the merits of Defendant's motion. First, under Rule 56(a) of the Federal Rules of Civil Procedure, a

party may move for partial summary judgment on a "part" of either their "claim or defense." Here, McGraw raised the statute of limitations as an affirmative defense in its Answer to GHPI's Complaint. A ruling by this Court, therefore, that GHPI had constructive notice as a matter of law would resolve a key "part" of McGraw's defense and greatly limit the scope of relevant discovery.

Second, the Muench case upon which GHPI relies is distinct from the case at bar. In Muench, the defendant sought a ruling on the abstract legal question of whether the discovery rule should apply to Copyright Act claims in the Second Circuit. In a terse, four-paragraph opinion, the court declined to reach the merits of defendant's motion because "[n]o party has submitted any evidence regarding when the alleged copyright infringements took place." Meunch, 2010 WL 8531498, at *1. Unlike the moving party in Meunch,[3] the moving party here (McGraw) is not seeking an abstract legal determination of when the statute of limitations clock begins to tick in all copyright cases, but a legal determination of whether the August 2006 and August 2007 incidents constituted "storm warnings" as a matter of law in this specific case. Further, the moving party in Meunch asked the court to resolve a legal question in the absence of any factual context. Here, by contrast, the parties have provided the Court with ample factual context to inform its storm warning determination.

Finally, to the extent that Graham requires that the actual dates of infringement be determined prior to issuing a ruling on inquiry notice, the evidence in the current record strongly indicates that some—and likely a large percentage—of the infringing acts took place prior to the alleged storm warnings. The record provides data, for example, showing that licenses for 1,584 of the 2,395 GHPI's photographs were issued prior to August 2006, with over 1,000 of the

---

[3] See Brief of Defendant, Muench v. Houghton Mifflin Harcourt Pub. Co., Inc., No. 09-2669, 2010 WL 8531498 (S.D.N.Y. Oct. 14, 2010), ECF No. 44.

8

licenses issued by the end of 2000. Compl. Ex. A. Although GHPI is correct that the date of issuance does not indicate the date of infringement, it is implausible that every single one of the infringements took place after the alleged storm warnings.[4] The Court will thus proceed to the merits of McGraw's motion.

B.     *Genuine Factual Dispute Exists About Whether GHPI Had Notice*

McGraw has failed to meet its burden of showing that the 2006 and 2007 incidents were, *as a matter of law*, sufficiently obvious to place any reasonable copyright holder on notice that other infringing activity might be afoot. While a jury may agree with McGraw's contention that the two incidents were sufficient to put GHPI on notice, GHPI has introduced evidence to enable a jury to reasonably reach the opposite conclusion as well. Further, the broad rule that McGraw asserts (i.e., that, irrespective of context, the discovery of a copyright violation places the injured party on inquiry notice of all other similar infringements) is not supported by any precedent in the Third Circuit, nor any prior decisions in the Eastern District. McGraw relies upon several district court decisions from other districts that addressed clearly distinguishable circumstances from those at issue here.

As discussed below, the cases McGraw cites are factually distinguishable from the instant dispute in at least three materially significant ways. First, none of the cases addressed a situation where, as here, the plaintiff's discovery of the copyright infringement was the result of the defendant's voluntary, unsolicited disclosure. This is significant because, as GHPI argues, a voluntary disclosure can reasonably be perceived as a demonstration of the disclosing party's

---

[4] Unlike in Waynesborough Country Club of Chester County v. Diedrich Niles Bolton Architects, Inc., No. 07-155, 2011 WL 5041377, *3 (E.D. Pa. Oct. 24, 2011), the Court does not rely here on "problematic and speculative assertion[s]" that are subject to later revision. In Waynesborough, the moving party sought a declaration of rights as to the extent of its liability for property damage, despite the fact that repairs were still being conducted on the property and evidence "continue[ed] to flood the docket" showing that the amount of damages "continue[d] to increase." 2011 WL 5041377, at *4.

good faith and honesty, thus serving to foster trust rather than erode it. Second, the cases McGraw cites involved parties that either were competitors in the same field (thus with inherently antagonistic interests), or did not have pre-existing relationships that fostered the kind of trust that GHPI could reasonably have had in McGraw—a licensee with whom it worked, without incident, for 11 years prior to the first alleged storm warning. Finally, the related infringements in the cited cases were far more obvious and easy to discover than the related infringements here. It was thus far less onerous to impose a duty to monitor on the plaintiffs in the cited cases than would be the case here.[5] This is particularly true when considering that GHPI had 2,000+ items that were subject to related infringements; the plaintiffs in the cited cases had a mere handful.

1. <u>**Weber v. Geffen Records, Inc.**</u>**, 63 F. Supp. 2d 458 (S.D.N.Y. 1999).**

The key distinguishing factor in <u>Weber</u> is that the related infringements were so open and notorious that they could have readily been discovered with the most menial of effort by the plaintiff. In the early 1980s, the plaintiff (Weber) co-wrote several songs with future members of the rock band Guns and Roses. In 1997, Weber filed an action alleging that Guns & Rose infringed his rights by using two of his songs (*Shadow of Your Love* and *Back Off Bitch*) without due attribution. The court, however, granted the defendants' motion to dismiss on statute of

---

[5] McGraw argues that whether or not the related infringing activity is "easily discoverable" is a matter that should be addressed in the second prong of the analysis (i.e., whether the plaintiff exercised reasonable due diligence), not in the first prong (i.e., whether the plaintiff should have suspected wrongful activity). Def's Reply Mem. at 7 n.4. In <u>Graham</u>, however, the Third Circuit defined inquiry notice as existing when "with due diligence" the plaintiff "should have discovered" the injury. 568 F.3d 438. Under the second prong of <u>Graham</u>, courts look at whether the plaintiff actually "*exercised* reasonable due diligence and yet [was] unable to discover [its] injuries." <u>Id.</u> (emphasis added). As worded, therefore, the <u>Graham</u> test suggests that the first prong is limited to injuries that *could* be reasonably discovered, whereas the second prong looks at whether the defendant *did in fact* reasonably persevere to discover them. Accordingly, where the infringing activity would be unduly burdensome for a plaintiff using reasonable diligence to discover, there would be no need to consider the second prong just as it would make little sense to require someone to demonstrate "reasonable diligence" in conducting an unreasonable task.

limitation grounds because it found that Weber had ample basis to learn of his injuries as early as 1989 and 1991. In 1989, Weber had filed a separate infringement claim against Guns & Roses for several other songs. As part of this 1989 action, Weber relied upon an August 7, 1987 copyright registration. Importantly, this same registration also included the registration for *Shadow of Your Love*. This fact was cited as the key basis for the court's dismissal of Weber's claims involving *Shadow of Your Love*. The court stated:

> "*This court is not holding that awareness of some number of violations necessarily yields constructive knowledge of all other violations by the same parties*. Rather, the holding is only that in 1989 plaintiff should have been aware of an infringement clearly stated on a public document integral to one of his then-existing infringement claims."

Weber, 63 F. Supp. 2d at 465 (emphasis added).

The court dismissed Weber's claims regarding *Back Off Bitch* on a similarly qualified basis. Specifically, in September 1991, while Weber's 1989 infringement action remained ongoing, Guns & Roses released *Back Off Bitch* in a new, highly publicized album. As the court noted, "[a] reasonably diligent person would not wait six months, as plaintiff did, to take even a cursory look at the new, widely released album from a musical group that very recently had repeatedly infringed his musical compositions." Id. at 466,

**2.      Fahmy v. Jay-Z, 835 F. Supp. 2d 783 (C.D. Cal. 2011).**

In Fahmy, the related infringements were not only open and notorious for anyone to discover, but involved the same copyright which the plaintiff had received storm warnings. The Fahmy plaintiff owned the copyright to an Egyptian melody (*Khosara, Khosara*) created by his deceased uncle that the musician Jay-Z included in the song *Big Pimpin'*. Although the plaintiff first became aware of the alleged infringement in December 2000, he did not file his complaint until August 2007. In the complaint, the plaintiff alleged copyright violations for several derivatives of *Big Pimpin'* that Jay-Z released subsequent to 2000, including an "expletive-free

11

version," an "acoustic version," and other iterations. Fahmy, 835 F. Supp. 2d at 789. The court dismissed these claims because plaintiff's knowledge that *Big Pimpin'* infringed his copyright "put [him] on constructive notice that there may be more infringing works on the market (especially produced by the same alleged infringer)." Id. at 790. The finding of constructive notice was "bolstered by the fact that plaintiff governs his uncle's entire music catalog and is charged with making business decisions concerning these songs." Id.

Although the Fahmy opinion does not indicate how many copyrighted songs the plaintiff held rights for, the plaintiff had a clear basis to suspect that future iterations of the song *Big Pimpin'* would infringe his copyright to *Khosara, Khosara*. Simply monitoring Jay-Z's widely released iterations of a single song would have required very little effort—and hence was a minor burden to impose.

3.      **Luar Music Corp. v. Universal Music Group, Inc., 847 F. Supp. 2d 299 (D.P.R. 2012).**

As in Fahmy, the related infringements in Luar were open and notorious infringements of the same copyrights for which the plaintiff had previously received storm warnings. Specifically, in 2005, the plaintiff (Luar Music) brought suit against VI Music Corp (a joint venture involving the defendant, UMG Recordings) for infringing its copyrights to two albums by the musician Don Omar. To resolve this dispute, the parties entered into a settlement agreement in November 2005, whereby the defendant's right to distribute Omar's music was limited to certain express terms. Shortly thereafter, however, the defendant began exceeding the scope of these terms by reproducing and distributing the same two Omar albums, as well as a compilation album containing an Omar song. By 2009, the defendant had sold enough copies of the two Omar albums (over one million) to certify both as "multi-platinum." Luar, 847 F. Supp.

2d at 303.  Despite this rampant, pervasive infringement of the same copyrights at issue in the settlement agreement, the plaintiff waited almost four years before filing a copyright claim.

**4.     Kepner-Tregoe, Inc. v. Exec. Dev., Inc., 79 F. Supp. 2d 474, 488 (D.N.J. 1999).**

In Kepner, the plaintiff received storm warnings twenty years prior to the lawsuit that the defendant (its competitor) was infringing the two copyrights at issue in the suit.  In 1975, the plaintiff (a training company for business managers) accused the defendant of infringing copyrighted materials in the latter's training course.  The accusation resulted in an exchange between the parties and an agreement by the defendant to remove the allegedly infringing material.  In 1997, the plaintiff discovered that the defendant's training course was once again using allegedly infringing content from the same two copyrights, and had been doing so since 1985.  The plaintiff argued that the defendant's representation, in 1975, that it would stop the infringing behavior excused its twenty-year delay in discovering the infringement.  The court rejected this argument.  According to the court, the plaintiff's accusation of infringement in 1975 "place[d] a duty on [the plaintiff] to monitor [the defendant's] products and to bring suit promptly if it" discovered an injury.  Kepner, 79 F. Supp. 2d at 488.  Although the Kepner opinion does not make it clear how easy it would have been for the plaintiff to discover the injury, the universe of material that the plaintiff had a duty to monitor (i.e., two of its copyrights in the training course of a specific competitor) was notably less broad than the universe of material at issue here (i.e., over 2,300 photographs with terms that limit use in a myriad number of ways).

**5.     A Third Storm Warning?**

Although the defendant does not raise the issue, there is a possibility that the plaintiff had inquiry notice as of April **16**, 2009.  This is significant because the plaintiff did not file this

action until April **18**, 2012. Accordingly, if inquiry notice was pegged to April 16, 2009, it would produce the same result that defendant seeks to achieve in trying to peg inquiry notice to 2006 or 2007. The circumstances are as follows:

On April **15**, 2009, a McGraw employee (Mike Conner) emailed GHPI for permission to include GHPI photographs in a printing of 500,000 textbooks that had a publication date of 2004 and for which GHPI had long ago granted licenses for 60,000 copies. Wasco Decl ¶ 33 & Ex. 7. As GHPI's President notes in her affidavit, "[t]his seemed odd since GHPI had already granted McGraw a license for the photographs in these books in 2004." Wasco Decl. ¶ 34. On April **16**, 2009, therefore, GHPI's Forry emailed Conner to get clarification on how many of the 500,000 copies had already been printed. Such information would enable GHPI to determine if McGraw had infringed its copyrights by exceeding the terms of the license prior to purchasing additional rights (thus subjecting it to the 10x liquidated damages). Later that day, Conner replied with a vague response that failed to answer the question (i.e., "That's hard to day [sic], but the total run will be up to 500,000 for 8 years from 2004 until 2012.") to which Forry replied by repeating her question (i.e., "at what date did the quantity exceed 60,000?"). Id. Ex. 7. Conner did not respond to this follow-up on April 16, or at any point prior to April **18.**

On April **21**, 2009, after having not heard from Conner for five days, Forry sent him another email with an iteration of the same question. Id. Ex. 7. Forry sent similar emails on April 28 and April 30. Conner finally responded on May 4 with a brief email (i.e., "Sorry for the delay in getting back to you. I've been out of the office. I will work on getting answers to your questions as soon as possible."). Conner did not provide any further information by May 12, which prompted another email from Forry wherein she warned "[i]f we don't have [the answers] by Friday 5/15, we will be sending an invoice for the full quantity of 500,000 units at a 10 x's

14

licensors terms and conditions definition as noted in our previous emails." Heeding GHPI's warning, another McGraw employee (Merilynne Cohen) emailed GHPI on May 15 with the requested print-run information. Id. ¶ Ex. 8. Cohen's email disclosed that McGraw had already printed over 300,000 copies of each textbook.

While the record includes subsequent communications between GHPI and McGraw from May 2009 through March 2012, the above facts may be relevant in determining if Conner's email on April 15, 2009 and his failure to respond to Forry's question by April 18, 2009, constituted sufficiently suspicious activity to put GHPI on notice of other wrongful activity. On one hand, Conner's lack of response meant that GHPI did not actually know as of April 18 that McGraw had exceeded the terms of its 2004 licenses. On the other hand, a fact finder could infer that Conner's failure to respond was evasive behavior that should have aroused suspicions prior to April 18 that wrongful activity had occurred (particularly in light of the 2006 and 2007 incidents). The question, however, is not whether a jury could find notice under these circumstances, but whether this is the only reasonable inference (so that the question can be decided as a matter of law). Considering the "heavy burden" of demonstrating notice at the summary judgment stage, the Court finds that the question of notice here is most properly characterized as a genuine factual dispute, although it is a closer call than with the alleged storm warnings in 2006 and 2007.

## VI. CONCLUSION

Based on the foregoing analysis, the Court concludes that constructive notice cannot be found as a matter of law. Accordingly, McGraw's Motion for Partial Summary Judgment will be DENIED.

An appropriate order follows.

O:\CIVIL 12\12-2061 grant v. mcgraw\msj_memo01.docx