**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GRANT HEILMAN PHOTOGRAPHY, INC. | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| THE MCGRAW-HILL COMPANIES, INC., and | : | NO. 12-2061 |
| JOHN DOES PRINTERS 1-10, | : | |
| | : | |
| Defendants | : | |

**MEMORANDUM RE: MOTION FOR PARTIAL  SUMMARY JUDGMENT**

**Baylson, J.**                                                                      **June 26, 2014**

Prior to a bellwether trial of copyright infringement claims brought by a stock photography agency against a publishing company, Plaintiff moves for partial summary judgment on its infringement claims and several of the Defendants' affirmative defenses.

On April 18, 2012 Plaintiff filed a complaint for 2,395 instances of copyright infringement.  On August 31, 2012, Defendants moved for summary judgment based on the statute of limitations (ECF 12), which this Court denied (ECF 28).  Defendants then moved to bifurcate the litigation into two stages, first to consider the statute of limitations, and a second stage to determine liability and damages (ECF 29).  This Court then ordered a bifurcated trial based on twenty-four invoices selected by Plaintiff and six invoices selected by Defendants (ECF 36).  Plaintiff filed a motion for partial summary judgment on April 28, 2014, which is presently before the Court (ECF 104).  Plaintiff seek summary judgment on claims of copyright infringement for the use of 57 images and on the following affirmative defenses Defendants asserted in their Answer: statute of limitations; lack of standing; copyright registrations are invalid or unenforceable; claims are barred by licensing or consent; claims are barred by

1

acquiescence, novation or satisfaction;[1] claims are barred by laches, estoppel or unclean hands;[2] and failure to mitigate[3] (ECF 104).

On June 11, 2014, this Court heard oral argument on the motion for summary judgment. (ECF 121). Plaintiff subsequently submitted a letter brief on June 16, 2014 arguing that courts can disregard testimony on the parties' course of dealing when it contradicts the express terms of an unambiguous contract. Defendants submitted a letter brief on June 17, 2014 responding to the cases Plaintiff submitted, and noting they could find no cases where the Third Circuit held the course of dealing altered the terms of a copyright license.

## I. FACTUAL BACKGROUND

### A. Undisputed Facts

Plaintiff is a company that licenses stock image photographs. Defendants are McGraw Hill Companies and associated corporate entities that produce textbooks. Plaintiff alleges 2,395 instances of copyright infringement against Defendants, based on 594 invoices (ECF 1). Plaintiff contends it granted limited licenses clearly defining the use permissions granted, and that Defendants exceeded the use granted for each of the images alleged.

Plaintiff issued Defendants thousands of licenses to use its photographs in publications between 1995 and 2011. In 2003, the parties entered into a Preferred Vendor Agreement (PVA), which established pricing for each kind of licensing. Pl's Ex. H. The agreement is a single page, comprised of a chart with pricing based on the size of the image and the number of copies. Pl's Ex. H. The terms specify that the base rate includes only the English language, distribution in the United States and 15% of World distribution, and gratis ancillaries provided to teachers. Pl's

---

[1] Defendants withdrew this affirmative defense in their responsive brief. Def's Resp. Br. at 4.
[2] Defendants have withdrawn this defense in light of the recent Supreme Court ruling in Petrella v. Metro-Goldwyn-Mayer, Inc., 12-1315, 2014 WL 2011574 (U.S. May 19, 2014). Def's Sur-reply Br. at 3 (ECF 112).
[3] Defendants did not respond to Plaintiff's motion seeking summary judgment on this defense, stating Plaintiff "has moved for summary judgment solely on liability." Def's Resp. Br. at 4.

Ex. H.  The PVA specified the additional fees for additional languages, World distribution, re-

licensing for new editions, and limits the total number of prints to 500,000.  Pl's Ex. H.

Each invoice for the images specified the number of copies, geographic distribution,

language, duration or number of editions, and media the images could be used.  Pl's Ex. E.  Term

and Conditions were printed on the back of each invoice.  Salient language includes the

following:

> Upon submission of and payment of an invoice for GHP, a license only is granted
> to use the images for the use specified on the invoice and for no other purpose,
> unless such images are purchased outright.  Such use is granted for the United
> States only, and only for a one-year period, unless otherwise specified. . . . If
> Recipient desires to re-use an image or extend previous usage, then Recipient
> must request and pay for additional rights prior to publication.  You agree not to
> make, authorize or permit any use of an image . . . except as authorized by the
> invoice.  In the event you utilize an image for any use other than that indicated on
> the invoice, including but not limited to the number of uses, the publication
> utilized, or the size of reproductions, GHP agrees to forego its right to sue for
> copyright infringement if you pay, as liquidated damages, a sum equal to ten (10)
> times the maximum price we would have charged for such use. . . If you fail to
> make such payment in ten (10) days, we shall have the right to sue for copyright
> infringement and breach of contract.

Pl's Ex. E.

The record reflects four instances where Defendants do not dispute that they used the

images beyond the terms of the invoices.  The first instance in the record began with a letter

dated April 8, 1999 from an attorney for the Picture Agency Council of America (PACA), Nancy

Wolff.  Def's Ex. 18.   Wolff wrote to the director of the Glencoe division of McGraw Hill that

in licensing images for the 2000 edition[4] of a biology text, members of the trade association

discovered that no license was granted for any of the images in the 1998 edition of the text.

Def's Ex. 18.  Wolff explained that use beyond what was specified in invoices required

additional fees, and unauthorized use violated the copyright:

---

[4] Textbook publishers commonly date the text edition a year or two later than the actual publication date.

As you know, most stock agencies operate under the same industry norms and practices. Photographs are licensed for a particular usage. All other rights are reserved to the owner. If additional usage or rights are necessary, further permission must be sought and granted. In reviewing certain representative licensing agreements for the 1995 Edition, the agencies clearly stated that the rights were limited to "One Time North American Reproduction English Language Rights, One Edition." The terms of most PACA members' invoice also provide that usage is limited to the rights granted on the invoice, and any use outside of the terms of the agreement constitutes copyright infringement. Unauthorized use entitles the agencies to receive a multiple of the fee it would have received had the use been with permission.

In response to this letter, Defendants wrote to Plaintiff on September 27, 1999 acknowledging they had "published a copyright update of this text in 1998 for which we did not obtain photo permission at that time" and enclosed a check for the image fee. Def's Ex. 20. Plaintiff returned a copy of the letter writing "Not Acceptable" on the signature line. Def's Ex. 20. Plaintiff eventually submitted an invoice that stated: "This invoice reflects a retroactive license fee for re-use of images without legal permission from Grant Heilman Photography." Def's Ex. 22.

Second, in 2006 Defendants wrote to Plaintiff, "Enclosed please find payment under our photo license agreement for usage in a print run larger than originally anticipated." Def's Ex. 26. Plaintiff wrote in response, "We are in receipt of the McGraw-Hill Companies check for payment for usage of imagery from our library where McGraw-Hill Companies has exceeded the terms of our original licensing agreements." Def's Ex. 29. Plaintiff accepted the check, but also submitted invoices for new licenses for the additional use, explaining that permissions for print runs beyond the original invoice are routinely treated as pick up fees for new licenses:

We are in receipt of the McGraw-Hill Companies check for payment for usage of imagery from our library where McGraw-Hill companies has exceeded the terms of our original licensing agreement . . . For the more than twenty years since I have been a part of Grant Heilman Photography, when publisher's [sic] books exceed their original printing quantities, the new licenses have been and currently are treated as pick up fees for new licenses. . . . [T]here is still a balance due to

4

bring our original licenses up to current rights and distribution you are requesting
. . . [T]o extend the printing quantities . . . the original license will be specified in
the body of rights of the invoice and at the top of the invoice in the line for P.O.
number.

Def's Ex. 29. The accompanying invoices stated they were an "extension of right to" a the

original invoice number. Def's Ex. 30.

The third incident was in 2008 when Plaintiff discovered Defendants printed an image

without obtaining a license when the Defendants sought to relicense the image for a new edition.

Def's Ex. 32. Plaintiff sent Defendants an invoice for "[r]etroactive license fee for [an] image

published and distributed without permission." Def's Ex. 34. The invoice billed $795 for the

image. Def's Ex. 34. This appears to be three times the $265 price indicated in the PVA pricing

chart. Pl's Ex. H.

Finally, in 2011 Plaintiff discovered Defendants had already published a text for which

they sought permissions. Plaintiff again wrote the use exceeded the license terms:

We have learned that this textbook has been published an[d] available for
purchase since January 21, 2011. Our terms and conditions states that
reproduction rights are granted only by creation and payment of our invoice prior
to publication. Therefore, since this image is being used without the proper
licensing, we reserve the right to charge a 10 times retroactive fee for this image.

Def's Ex. 48. Plaintiff then sent Defendants an invoice which states "licensing fee reflects a ten

(10) times licensors terms and conditions definition." Pl's Ex. G. This refers to the "Terms As

To Use" printed on the back of each GHPI invoice imposing a penalty of ten times the price for

unauthorized use of copyrighted material.

Plaintiff produced evidence from Defendants' records showing Defendants used their

images in more copies than were authorized under the terms of the invoices. Pl's Exs. 1-18.

Finally, Plaintiff produced copies of U.S. Trademark Registration certificates for each of the

images. Pl's Ex. D. Plaintiff also produced copies of assignment agreements from each of the

photographers who created the images that Plaintiff licensed. Pl's Ex. C. These agreements granted Plaintiff the "sole and exclusive agent and representative with respect to the sale, license, and lease of all Photographer's photographs accepted into the files of [GPHI]." Pls' Ex. C. **B. Disputed Facts**

Defendants dispute that the terms of the invoices constitute licenses. Defendants contend that the licenses are instead comprised of "all the relevant communications and documents concerning the parties' transaction for that particular photo" including the pricing agreement invoices, all written, electronic and oral communications, "and the parties' understanding as exhibited by their decades-long course of dealing." Def's Response to Pl's Statement of Undisputed Facts ¶8. Defendants further posit that the invoices did not limit the use of the images, but instead merely reflected Defendants' estimates of their anticipated use at the time. Behnke Dep. 26:1-28:7 (testifying as the corporate designee for Defendants that "when we have the photos, we decide what products to use them in and then we report back to the rights owners to request the invoice for that use"). Defendants point to testimony that when the actual use exceeded the anticipated use, Defendants paid a new invoice for the additional use of the images. Behnke Dep. 36:3-6 (testifying that Defendants' understanding was that they had unlimited permission to use the images, but had to pay for that use according to the price points in the PVA); Norton Dep. 26:8-23 ("We had permission to use [the image] when Grant Heilman gave us the image. We – if we went over the 250, we would need to request for additional units."); Def's Ex. 31.

Defendants produced an expert report prepared by GHPI President Sonia Wasco for a different litigation between Michael Bergt and Houghton Mifflin in 2008. Def's Ex. 31. In the report Wasco explained the industry practice of licensing when use exceeded the original license:

We had an understanding with publishers to open negotiations for additional fees should the licensing rights they required exceed the terms of our vendor agreements. Using these criteria for establishing new licenses, each time the image user printed a new quantity, they should have come back to the licensor and requested rights for that specific quantity. . . . [But] in cases where unauthorized printing occurs and is discovered by the licensor, a common industry practice would be to access [sic] a 3 times multiplier to the original licensing fee for a new license to include the additional quantity.

Def's Ex. 31. Wasco further explained that it was customary to grant a 50% discount for new quantities of the same edition of a text when permission was sought in advance, but "[i]f permission was not requested in advance of printing, then no discount fees are offered." Def's Ex. 31.

Plaintiff responded that the course of dealing contradicts Defendants' assertion that the invoices were not licenses. Plaintiff contends that the same incidents Defendants point to in support of their argument for implied licenses show the invoices did in fact set the terms of use, and each instance of use beyond the terms of the invoice was acknowledged as use without permission. In addition, Plaintiff points to testimony by Defendants' corporate designee witness Lange who agreed that Defendants did not have permission to print 60,000 copies of an image when the invoice limited the print run to 40,000 copies. Lange Dep. 124:8-19 (agreeing "that would be beyond the scope of the license granted. . . ."); see also Simmons Dep. 40:2-14 (testifying as a corporate designee that Defendants are not permitted to publish an image in a German language edition of a text where the invoice specifies English and Spanish).

Finally, Plaintiff produced numerous requests for permissions to use images beyond the scope of the use defined in the original invoices. Pl's Ex. 11. For example, in July 2004 Defendants wrote an email to Plaintiff requesting "permission to reuse the following images" in a new edition of a science textbook. Pl's Ex. 11. Similarly, in November of 2006 Defendants sent an email to Plaintiff requested permission to reuse images for digital content and an

additional language than was specified in the original invoice. Pl's Ex. 11 (the email requested, "Please state the use information on the invoice." (some capitalization omitted)). Each of these requests sought permission for use prior to the publication of the image. Pl's Ex. 11.

Since the terms of the contract present mixed questions of fact and law, this issue is further discussed in the legal analysis.

## II.    ANALYSIS

### A. Standing

Under the Copyright Act, "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled, . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501. The Copyright Act defines the "exclusive rights" that grant standing to sue:

> [T]he owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
>
> (1) to reproduce the copyrighted work in copies or phonorecords;
>
> (2) to prepare derivative works based upon the copyrighted work;
>
> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
>
> (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;
>
> (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and
>
> (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C. § 106.

Plaintiff has produced copies of agreements with each of the photographers who created the works at issue.  There are three sets of agreements.  The first appear to be the original agreements with the photographers, dated in the early 1990s, which convey to GPHI the "sole and exclusive agent and representative with respect to the sale, license, and lease of all Photographer's photographs accepted into the files of [GPHI]."  Pls' Ex. C.  The agreement also conveyed to GHPI the "right to arrange for the alteration or distortion of any photograph" and "[a]t its sole discretion . . . to make and use duplicate transparencies, or black and white conversion negatives, from Photographer's original color transparencies."  Pl's Ex. C.  GPHI was also permitted to use any of the images "until the published work is exhausted, whether the Photographer's contract has expired or not."  Pl's Ex. C.   Under the agreement the "[p]hotographer shall not . . . sell, license, lease or otherwise use for any purpose whatsoever, any photograph placed in the Inc. files, or any similar or duplicate photograph." Pl's Ex. C.

The second set of agreements, executed in the early 2000s, are riders to the original agreements, amending some of the compensation terms.  Pl's Ex. C.  The final set of exhibits are agreements conveying rights "for the purposes of litigation."  Pl's Ex. A.  These agreements were executed between 2008 and 2011.  Pl's Ex. A.

Defendants are correct that the last set of agreements do not grant GHPI exclusive rights to distribute or exploit the images in question. See Minden Pictures, Inc. v. Pearson Educ., Inc., 929 F. Supp. 2d 962, 968 (N.D. Cal. 2013) (holding copyright assignments do not support standing under the Copyright Act under Ninth Circuit caselaw).  Defendants cite to Righthaven LLC v. Hoehn where the Ninth Circuit held the stock photography agency did not have standing because in the photographer assignment agreements "all it was really assigned was a bare right to sue for infringement." 716 F.3d 1166, 1169 (9th Cir. 2013) (affirming summary judgment for the

defendants). The contracts in <u>Righthaven</u> did not grant exclusive rights under the Copyright Act, because the agreements imposed significant limits on the plaintiff's use of the works, and conveyed no right to "reproduce the works, distribute them, or exploit any other exclusive right under the Copyright Act." <u>Id</u>. at 1170. In contrast, the photographer "retained 'the unfettered and exclusive ability' to exploit the copyrights." <u>Id</u>. at 1170.

Here the initial agreements and supplementary riders with the photographers did grant GHPI the exclusive right to sell, license, use, distribute, alter, and duplicate the images. Pl's Ex. C. <u>Cf</u>. <u>Minden Pictures</u>, 929 F. Supp. 2d at 967 (excluding the agency agreements as a discovery\, and only considering the copyright assignment agreements).

The agreements conveyed the first three rights enumerated in the Copyright Act: the right to reproduce, prepare derivative works, and to distribute the copyrighted work. 17 U.S.C. § 106. The last three rights only apply to performance works, and are not relevant to this consideration. <u>Id</u>. Thus, Plaintiff has produced evidence it has sufficient ownership interest in the images at issue to have standing to bring claims for copyright infringement.

### B. Copyright Infringement

To establish copyright infringement, the plaintiff must show (1) ownership of a valid copyright and (2) the defendant's unauthorized copying of protected elements of the copyrighted material. <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 361 (1991).

### 1. Ownership of a Valid Copyright

"Certificates of registration issued by the U.S. Copyright Office constitute prima facie evidence of the validity and ownership of the material." <u>Ford Motor Co. v. Summit Motor Products, Inc.</u>, 930 F.2d 277, 290-91 (3d Cir. 1991). Plaintiff produced copies of the certificate of registration for each of the 57 images that are presently at issue. Pl's Ex. D.

**2. Unauthorized Use of Copyrighted Material**

The parties do not dispute that the Plaintiff's evidence showed Defendants used their copyrighted images in more publications than were specified on the GHPI invoices. Defendants contend the parties' course of dealing demonstrates that they had an implied license for their use of the images.

Although a license can be a defense to a claim for copyright infringement, "the licensor can still bring suit for copyright infringement if the licensee's use goes beyond the scope of the nonexclusive license." MacLean Associates, Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc., 952 F.2d 769, 779 (3d Cir. 1991) (reversing a directed verdict for the defendant because the record did support a finding of a broad nonexclusive license or implied license). "A licensee infringes the owner's copyright if its use exceeds the scope of its license. The critical question is not the existence but the scope of the license." S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081, 1087-88 (9th Cir. 1989) (citing Gilliam v. American Broadcasting Cos., 538 F.2d 14, 20 (2d Cir. 1976)). The parties dispute whether the GPHI invoices alone established the terms of the licenses, or whether through the course of conduct Defendants had an implied license to use the images beyond the limitations stipulated in each invoice.[5]

The Third Circuit has not articulated a standard for determining when a course of dealing may give rise to an implied license. Marino v. Usher, No. 11-6811, 2014 WL 2142118, at *7 (E.D. Pa. May 21, 2014) (citing MacLean, 952 F.2d at 778–79 (holding delivery of a copy of the

---

[5] Judge Gardner of this Court has considered the scope of identical GHPI licenses in another case where GHPI sought a preliminary injunction against publisher John Wiley & Sons. Grant Heilman Photography, Inc. v. John Wiley & Sons, Inc., 864 F. Supp. 2d 316, 320 (E.D. Pa. 2012). In John Wiley & Sons GHPI contended that the defendant purchased very limited rights to use the plaintiff's photographs at a low price with the intention of using the images much more extensively. Id. at 320. The defendant did not dispute that the "[i]nvoices sent to Wiley by Heilman Photography contained the license limitations for the images included in the invoice." Id. at 321. Accordingly, Judge Gardner held GPHI was likely to succeed on the merits because the evidence showed the defendant used the images beyond the scope specified in the invoices. Id. at 328 (denying the preliminary injunction because the plaintiff failed to demonstrate immediate and irreparable harm).

work is only one factor to find an implied license, but not articulating any of the other factors)). In an unpublished opinion the Third Circuit applied the following factors from the D.C. Circuit test: "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." Nat'l Ass'n For Stock Car Auto Racing, Inc. v. Scharle, 184 F. App'x 270, 275 (3d Cir. 2006) (quoting Atkins v. Fischer, 331 F.3d 988, 991–92 (D.C. Cir. 2003) (affirming summary judgment for the defendant, NASCAR, where the undisputed facts showed the plaintiff granted an implied license because the plaintiff was asked to create a image for a NASCAR trophy, he understood the scope of the trophy's use and knew the he would not be credited for his work, and he delivered the image to NASCAR)). The alleged infringer bears the burden of establishing an implied license as an affirmative defense. Scharle, 184 F. App'x 270, 275 (3d Cir. 2006) (citing Atkins, 331 F.3d at 992).

In Atkins v. Fischer the D.C. Circuit reversed a grant of summary judgment for the plaintiff on her copyright infringement claims because the scope of the implied license was in dispute. 331 F.3d at 991. The plaintiff executed a written agreement to create a packaging design for the defendant's beer. Id. at 990. The contract specified two stages of the project: the first for color illustrations and the second for a final logo and camera-ready art. Id. The plaintiff produced the illustrations, but never reached the second phase of the project because the defendant said he was unhappy with her work. Id. Yet, the defendant used the plaintiff's designs on his beer labels. Id. The district court held the plaintiff granted an implied license, and granted summary judgment to the defendant. Id. at 992. The D.C. Circuit reversed because there was a genuine dispute whether the plaintiff intended the defendant to use her work. Id. at

933.  The evidence showed that the illustrations were not to be the final design, and the parties' correspondence was vague on the issue.  Id.  Moreover, it was unclear that the agreement granted an implied license to use the illustrations for commercial production without further compensating the plaintiff, because the fees for the second stage of the project were substantially higher.  Id.  ("Arguably, Atkins' acceptance of the relatively small payment of $2000 for the use of her copyright designs supports a finding that the intent of the parties was that only a limited license be conveyed.").  Accordingly there was a genuine issue of fact regarding the plaintiff's intent, precluding summary judgment.  Id. at 993.

In a recent opinion issued by this Court, Judge Diamond applied the Atkins factors to find a plaintiff did grant the defendants an implied license to use song lyrics.  Marino, 2014 WL 2142118, at *7 (granting the defendants summary judgment on the plaintiff's copyright infringement claims).  The plaintiff testified that he understood the defendant's intended use of the song and agreed to permit the defendants to use his song in an upcoming album.  Id. (noting the plaintiff testified he was excited about the prospect of Usher recording his song).  The plaintiff's conduct demonstrated that he delivered the song to defendants with the intent that they use and distribute the work: the plaintiff converted the digital files of the song to facilitate the defendant's use of the files, made numerous revisions to the song, celebrated the album's release, and never challenged the defendants' use of his song.  Id.  These facts demonstrated the plaintiff granted an implied license to the defendants to "use and exploit" the song.  Id.

Several district courts across the country have considered whether textbook publishers had acquired an implied license to use the images beyond the terms stipulated in the licensor's invoice.

In <u>Bean v. Pearson Educ., Inc.</u> the District Court of Arizona rejected the defendant's argument that the plaintiff granted an implied licensed by routinely granting extensions to publish more copies than the original license permitted. 949 F. Supp. 2d 941, 947 (D. Ariz. 2013) (granting the plaintiff's motion for summary judgment on its copyright infringement claims). The court found there was no evidence that the publisher could use the images without first requesting and obtaining an extension of the license. <u>Id.</u> at 946. Accordingly, there was no meeting of the minds that the publisher could use the images beyond the limits set in invoices and later remit payment. <u>Id.</u> ("From this testimony it is evident that neither party believed that Pearson had an implied license to exceed the scope of the license terms. Plaintiff did not deliver their photos to Pearson with the intent that Pearson would print them in excess of the limits that had been agreed to in the licenses.").

In <u>Wood v. Houghton Mifflin Harcourt Pub. Co.</u>, the District Court of Colorado similarly found the terms of use printed on invoices were licenses that limited the scope of use. 589 F. Supp. 2d 1230, 1239 (D. Colo. 2008) (granting summary judgment to the plaintiff on copyright infringement claims for a number of the images in dispute). The defendants contended that the print run limitation stated in the invoices was merely boilerplate language and that under general industry standards payment of an invoice specifying a print run of 40,000 enabled a publisher to print millions of copies without obtaining additional permission or paying additional fees. <u>Id.</u> at 1241-42. But the only evidence of this industry standard was the testimony of defendants' corporate designee, which the court rejected because he was not qualified to testify as an expert. <u>Id.</u> at 1241-42 (noting the testimony was "patently self-serving").

In <u>Psihoyos v. Pearson Educ., Inc.</u>, the Southern District of New York denied a plaintiff's motion for summary judgment because the defendants submitted evidence the plaintiff intended

for the publisher to use the images and subsequently remit payment. 855 F. Supp. 2d 103, 106-7 (S.D.N.Y. 2012) (denying the plaintiff's motion for summary judgment on copyright infringement claims). The evidence showed the publisher routinely waited until the time of publication, or even after publication, to obtain the licenses. Id. at 208 ("Defendants have submitted numerous invoices from Getty showing a "start date" of a license (i.e., the date on which the permitted use begins) that is weeks, months, or even over a year earlier than the date of the invoice itself."). The court found that the defendants' failure to prepay the required license fee did not negate the implied license because it was a breach of a contract covenant, not a breach of the license conditions. Id. at 214. The defendants' evidence presented genuine questions of material fact whether "the course of conduct between two parties demonstrates that there was a 'meeting of the minds' that the practice of occasionally backdating licenses was permissible—in other words, if the plaintiff demonstrated 'knowledge of, and acquiescence' to the practice of backdating licenses—then it is reasonable not to impose copyright infringement liability when a defendant engages in this practice." Id. at 125.

Two other courts have found implied licenses where the publisher produced evidence the plaintiffs routinely paid for the images after the publication was printed. In an unpublished opinion, the Ninth Circuit found the failure to pay was a breach of covenant of a contract, not a violation of a condition to a copyright license, because the publishers only owed payment after the defendant published the copyrighted images. Falcon Enterprises, Inc. v. Publishers Serv., Inc., 438 F. App'x 579, 581 (9th Cir. 2011) ("The parties' conduct demonstrate[d] that Falcon granted Publishers an ongoing nonexclusive implied license to use its content for a fee."). Similarly, the District Court of Alaska found testimony by the plaintiff's president that the publisher could use the images "as they wanted" and then submit payment "after they're used"

presented a genuine question of fact whether the plaintiff granted an implied license. Alaska

Stock, LLC v. Pearson Educ., Inc., 975 F. Supp. 2d 1027, 1042 (D. Alaska 2013) (crucially, this

evidence was from testimony by the plaintiff's witnesses). Thus, in all of the cases on which

Defendants rely, the evidence showed the licensor routinely permitted use of the images prior to

granting permission or receiving payment.

Defendants in this case have not presented such evidence. In each of the four instances

Plaintiff granted Defendants a retroactive license, the accompanying documents noted the

Defendants' use was in violation of the licensing agreement. See Def's Ex. 20 ("This invoice

reflects a retroactive license fee for re-use of images without legal permission from Grant

Heilman Photography."); Def's Ex. 29 ("McGraw-Hill Companies has exceeded the terms of our

original licensing agreements."); Def's Ex. 34 ("Retroactive license fee for image published and

distributed without permission."); Def's Ex. 48 ("[S]ince this image is being used without the

proper licensing, we reserve the right to charge a 10 times retroactive fee for this image.").

In fact, going back to the first instance in 1999, Defendants wrote to Plaintiff that it

"published a copyright update of this text in 1998 for which we did not obtain photo permission

at that time." Def's Ex. 20. Moreover, Plaintiff produced evidence that Defendants routinely

requested extensions for use of the images in additional print runs, language and editions prior to

publication. This is the same course of conduct the District of Arizona found distinguished its

license agreement from the cases in Falcon and Psihoyos. Bean, 949 F. Supp. 2d at 947.

Defendants point to testimony by their corporate designees to show that there was an

implied license to use the images without limitation, subject to payment proportional to the use

as outlined in the PVA. Norton Dep. 26:8-23 ("The price we paid was for the estimates, or the

united of 250,000, and if it went over that we would need to pay more. . . . We had permission to

use [the image] when Grant Heilman gave us the image. We – if we went over the 250, we would need to request for additional units."); and Benke Dep. 36:3-6 (agreeing that it was her "understanding that you had unlimited permission but you had to pay for those uses"). Unlike the evidence in <u>Falcon</u>, <u>Psihoyos</u> and <u>Alaska Stock</u>, none of the testimony suggests that Defendants routinely submitted payment for additional use after publication.

Furthermore, the question is not merely what Defendants believed they had permission to use, but whether Plaintiff intended Defendants to use the images without limitation. As the court in <u>Psihoyos</u> explained, "the question comes down to whether there was a 'meeting of the minds' between the parties to permit the particular usage at issue." 855 F. Supp. 2d at 124. Unlike the testimony presented in <u>Alaska Stock</u>, Defendants have not presented any evidence that Plaintiff had knowledge and acquiesced to Defendants' unlimited use of the images without seeking prior permission. Rather, all of the correspondence shows that Plaintiff consistently asserted "rights are granted only by creation and payment of our invoice prior to publication." Def's Ex. 48.

Crucially, each and every time Defendants were granted a retroactive license, Plaintiff noted that the license was for "use without permission." Def's Ex. 20 ("without legal permission"); Def's Ex. 29 ("exceeded the terms of our original licensing agreements"); Def's Ex. 34 ("without permission"); Def's Ex. 48 ("without the proper licensing"). Accordingly, there is no evidence showing the parties agreed to an implied license granting Defendants unlimited use of the images. The Court concludes Defendants infringed on Plaintiff's copyrights by using the images beyond the terms specified in the accompanying invoices.

## B. Statute of Limitations

The statute of limitations to bring claims under the Copyright Act is three years. 17 U.S.C. § 507(b). Ongoing infringement supports a copyright violation from the date of the most

recent infringing act.  Petrella v. Metro-Goldwyn-Mayer, Inc., __ S.Ct. __ 12-1315, 2014 WL

2011574, at *6 (U.S. May 19, 2014) (reversing the Ninth Circuit order affirming dismissal of a

copyright infringement claim based on laches).  Plaintiff filed this action on April 18, 2012.

Accordingly, the statute of limitations expired on claims that accrued prior to April 18, 2009.

The parties dispute whether Plaintiff's claims are tolled under the discovery rule.

 The Supreme Court recently held that laches did not bar a copyright infringement claim

when the most recent act of infringement occurred within the limitations period.  Id. at *6

("Under the Act's three-year provision, an infringement is actionable within three years, and

only three years, of its occurrence.").  The Court applied the incident of injury rule to determine

the date of accrual in addressing the laches question.  Id. at *6 n.4.  In a footnote, the Court noted

that this standard was in conflict with the discovery rule followed by nine circuits, including the

Third Circuit.  Id.  But the Court specifically stated "we have not passed on the question."  Id.

 While the language related to the statute of limitations is suggestive, this Court does not

find that Petrella overruled the Third Circuit discovery rule.  First, the Supreme Court explicitly

stated it was not deciding that issue.  Second, Petrella was a case about laches, and the holding is

limited to that issue.  Third, the comment's placement in a footnote demonstrates it was intended

as dicta.  Finally, this Court cannot find that a comment in a footnote overrules the standard in

nearly every circuit in the country.  Accordingly, the discovery rule still applies to determine

whether Plaintiff's claims are barred by the three-year statute of limitations.

 Under the Third Circuit discovery rule, the statute of limitations is subject to equitable

tolling until "the plaintiff discovers, or with due diligence should have discovered, the injury that

forms the basis for the claim."  William A. Graham Co. v. Haughey, 568 F.3d 425, 438 (3d Cir.

2009) (internal quotations omitted) (Graham I), William A. Graham Co. v. Haughey, 646 F.3d

138, 150 (3d Cir. 2011) (clarifying that the discovery rule articulated in <u>Graham I</u> was not a rule of accrual, but instead is a rule of equitable tolling). The court in <u>Graham I</u> explained the question is whether the plaintiff "should have known of the basis for its claims, which depends on whether it had sufficient information of possible wrongdoing to place it on inquiry notice or to excite storm warnings of culpable activity." <u>Graham I</u>, 568 F.3d at 438 (quoting <u>Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P.</u>, 435 F.3d 396, 400 (3d Cir. 2006)) (alterations omitted). The defendant bears the burden of showing such storm warnings. <u>Id.</u> The burden then shifts to the plaintiff to show it exercised reasonable diligence, but was unable to discover the infringing use. <u>Id.</u> (quoting <u>Benak</u>, 435 F.3d at 400).

In <u>Graham II</u> the Third Circuit held "that the 'accrual' of a cause of action occurs at the moment at which each of its component elements has come into being as a matter of objective reality, such that an attorney with knowledge of all the facts could get it past a motion to dismiss for failure to state a claim." <u>Graham II</u>, 646 F.3d at 150.

In a previous ruling, this Court denied Defendants' motion for summary judgment based on the statute of limitations because questions of fact remained regarding when Plaintiff had notice that Defendants were infringing its copyrights. <u>Grant Heilman Photography, Inc. v. McGraw-Hill Companies, Inc.</u>, No. 12-2061, 2012 WL 5944761, at *3 (E.D. Pa. Nov. 28, 2012). This Court found the facts of this case unique because Defendants voluntarily disclosed their unpermissioned use of the photographs. <u>Id.</u> at *5. This supported Plaintiff's argument that it reasonably believed Defendants were acting in good faith, and did not have reason to conduct an investigation into widespread copyright infringement. <u>Id.</u> (distinguishing the cited cases which were between competitors who did not have the "pre-existing relationships that fostered the kind

of trust that GHPI could reasonably have had in McGraw—a licensee with whom it worked, without incident, for 11 years prior to the first alleged storm warning").

Following the discovery rule of equitable tolling articulated in <u>Graham I</u> and <u>Graham II</u>, Plaintiff must show there is no genuine question of fact that Plaintiff had no inquiry notice of Defendants' infringement before April 18, 2009. <u>Id.</u>

Defendants have produced evidence that Plaintiff had notice of Defendants' infringing use in 1999.[6] As recounted in the facts section, Defendants admitted to using images in a 1998 edition of a biology textbook "for which we did not obtain photo permission at that time." Def.'s Ex. 20. In response, Plaintiff imposed a penalty of an additional $10,700 in licensing fees, and wrote "[t]his invoice reflects a retroactive license fee for re-use of images without legal permission from Grant Heilman Photography, Inc." Def's Ex. 22.

On November 12, 1999, GPHI President Sonia Wascoe received an industry newsletter alert about Defendants' failures to obtain licensing permissions for images prior to publishing a number of texts. Def's Ex. 23. The notice was a follow-up story to the alert about Defendants' failure to obtain licensing for the 1998 biology text:

> It now seems that was only one of the problems. Glencoe has produced another series of science books for middle schools for which they have not cleared copyright or made proper payment. . . . At this point, Glencoe is clearly in violation of federal copyright law for everything image in these books since they did not request a license prior to publication. Based on what just recently happened with Dynamics of Life this is not a single oversight, but a pattern.

Def's Ex. 23.

In 2008 Plaintiff discovered that Defendants failed to obtain licensing for photos in a text published in 2006. Def's Ex. 32. In response to this unpermissioned use, Plaintiff sent

---

[6] This Court was not presented with evidence on this 1999 incident when considering Defendants' motion for summary judgment.

Defendants an invoice for three times the PVA licensing fee, and the invoice stated it was for a "[r]etroactive license fee for image published and distributed without permission." Def's Ex. 33.

Defendants have presented sufficient evidence to raise a genuine question of fact whether Plaintiff should have known Defendants were engaged in a widespread practice of copyright infringement. First, the evidence on the record shows Plaintiff had notice that none of the images in the 1998 biology text were licensed, and Plaintiff noted this use was "without legal permission." Def's Ex. 22. Second, Plaintiff had notice that this problem "was not a single oversight, but a pattern."[7] Def's Ex. 23. Third, the evidence indicates that Plaintiff had first-hand knowledge of a pattern of infringement with incidents from 1999, 2006, 2007[8] and 2008. A reasonable jury could find that these numerous incidents of use beyond permissions put Plaintiff on notice that Defendants were engaged in widespread copyright infringement.[9]

Defendants do not dispute that Plaintiff is entitled to "recover any resulting damages" from infringement that occurred from April 18, 2009 onward. But, Plaintiff has not produced clear evidence that any of the infringing use occurred after April 18, 2009.

Plaintiff produced a chart of each of the fifty-seven images presently at issue which includes the publication title, the invoice number and date, the ISBN of all the editions and ancillaries in which the image was published, and the Defendants' use beyond the permissions granted. Pl's Ex. 2. To support the infringing use, Plaintiff submitted copies of Defendants' own

---

[7] Plaintiff responds that this was exclusively within the Glencoe division of McGraw Hill, and could not have put Plaintiff on notice that there was a widespread infringement problem. But the 2008 incident involved a McGraw Hill text from the Higher Education division. This evidence shows Plaintiff had notice the problem extended beyond the Glencoe division.
[8] See Grant Heilman Photography, Inc., 2012 WL 5944761 at *2 (recounting a 2007 incident where a photo research firm working on behalf of Defendants wrote to Plaintiff seeking an adjusted invoice for actual use that exceeded permitted use).
[9] Under the accrual rule articulated in Petrella, Plaintiff could produce evidence that Defendants' infringing use continued beyond April 18, 2009. From the record presented, the most recent date of infringing use is unclear.

records showing the print run and ISBN for each of the publications where the images appeared. Pl's Exs. 2-18.

Three of the publications in these records were printed on or after 2009. Two of the three publications, Essentials of Biology Custom Print Adaptation ISBN 0077329465 and Biology 9/e Interactive Student CD ISBN 007326525X, do not appear in Plaintiff's chart of copyrighted images. Pl's Ex. 2 (chart), Pl's Ex. 12 (Essentials of Biology), Pl's Ex. 5 (Biology 9/e). Plaintiff's chart does show three images were used in 2009 beyond the scope of the license granted in invoice number 203794 when they were printed in Environmental Science 10/e Chinese Short Form ISBN 0073204803. Pl's Exs. 2 & 17. But the Defendants' records only state the publication date as 2009 and do not specify when in 2009 the images were used. Accordingly, this Court cannot grant Plaintiff partial summary judgment because there remain questions of fact regarding whether the statute of limitations bars Plaintiff's claims.

This Court shall grant Plaintiff leave to amend the partial summary judgment record within fourteen (14) days if Plaintiff can produce undisputed evidence showing the infringing use of the subject images occurred within three years of filing the complaint. Defendants may respond within fourteen (14) days.

## IV.    CONCLUSION

Based on the above discussion, Plaintiff is likely entitled to a jury instruction that Defendants' use of the images beyond the terms specified in the invoices was copyright infringement. But this Court cannot grant partial summary judgment to Plaintiff because Plaintiff has failed to show any specific infringing use within the three years prior to filing the complaint, and questions of fact remain as to whether the earlier infringing use is subject to equitable tolling. Plaintiff may supplement the partial summary judgment record with

undisputed evidence that shows Defendants used the images at issue beyond the scope of the permissions granted in the original invoice after April 18, 2009.

Since genuine questions of fact remain regarding whether the statute of limitations was tolled  until Plaintiff filed its claims, Plaintiff's motion partial for summary judgment shall be denied, without prejudice.

O:\CIVIL 12\12-2061 grant v. mcgraw\12cv2061.msj.memo.docx