**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **GRANT HEILMAN PHOTOGRAPHY, INC.**<br><br>          **v.**<br><br>**MCGRAW-HILL GLOBAL EDUCATIONAL HOLDINGS, LLC, MCGRAW-HILL SCHOOL EDUCATION HOLDINGS, LLC, and JOHN DOES PRINTERS 1-10** | **CIVIL ACTION**<br><br>**NO. 12-2061** |

Baylson, J.                                                        **March 20, 2015**

## MEMORANDUM RE DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

The essence of the concept that a photograph enjoys a copyright, and that unlicensed use of a photograph is infringement, is reflected in the comment by the famous photographer Ansel Adams, "You don't just take a photograph, you make it."

Defendants McGraw-Hill Global Education Holdings, LLC and McGraw-Hill School Education Holdings, LLC ("McGraw-Hill") move under Fed. R. Civ. P. 50(b) for judgment as a matter of law following a jury verdict in favor of Plaintiff Grant Heilman Photography, Inc. ("GHPI") in a bellwether trial on GHPI's claims of copyright infringement against McGraw-Hill. At issue is whether the Court should find that GHPI was on inquiry notice of widespread copyright infringement by McGraw-Hill prior to April 18, 2009, three years before GHPI filed this lawsuit and the expiration date for accrual of claims under the Copyright Act's three-year statute of limitation, 17 U.S.C. § 507(b).   The jury found that McGraw-Hill had not proven that GHPI was on inquiry notice before April 18, 2009 and that GHPI discovered facts sufficient to file a claim

1

against McGraw-Hill only in October 2009.   Accordingly, under the Third Circuit's "discovery rule," the jury's findings rendered GHPI's claims accruing before April 18, 2009, timely, and the jury awarded damages in favor of GHPI for those claims in the bellwether trial.

McGraw-Hill contends, however, that the jury's findings were contrary to law and that the evidence demonstrates that GHPI knew or should have known that McGraw-Hill was committing copyright infringement before April 18, 2009.   McGraw-Hill argues that these "storm warnings," as a matter of law, placed GHPI on inquiry notice and triggered a duty on the part of GHPI to undertake a reasonably diligent investigation of potential copyright infringement by McGraw-Hill. McGraw-Hill contends GHPI cannot meet its burden of showing that it carried out any investigation—let alone a reasonably diligent one.   Accordingly, McGraw-Hill contends the evidence requires the Court to grant judgment as a matter of law in its favor and to find that GHPI's claims accruing before April 18, 2009, are untimely.

The Court has carefully considered the evidence and arguments put forward by both sides on what is a very close question.   If the Court were to evaluate the testimony of GHPI President Sonia Wasco in isolation, the Court would likely agree with McGraw-Hill that the evidence showed GHPI was on inquiry notice.   However, the Court must give substantial weight to the jury's verdict, as well as to all of the evidence produced at trial, in the light most favorable to GHPI, showing that McGraw-Hill was not aware of the extent of its own copyright infringement until 2013, that McGraw-Hill's recordkeeping was deficient, and that the parties had developed a course of dealing whereby any corrective action as to McGraw-Hill's copyright infringement was made retroactively.   From this evidence, the jury could have concluded (i) that an objectively reasonable plaintiff would not have been on inquiry notice of McGraw-Hill's prior instances of

copyright infringement and/or (ii) that any effort by GHPI to raise issues or question McGraw-Hill about infringements would not have led to a different result.   Accordingly, the Court will deny McGraw-Hill's motion for judgment as a matter of law.

## I.   Procedural History

GHPI is a stock photography agency that has licensed thousands of photographs to McGraw-Hill, a publisher of textbooks, educational materials, and other publications.   On April 18, 2012, GHPI sued McGraw-Hill alleging 2,395 instances of copyright infringement between 1995 and 2011 in which McGraw-Hill exceeded the terms of GHPI's licenses on photographs.

On August 31, 2012, McGraw-Hill moved for partial summary judgment based on the statute of limitations (ECF 12).   McGraw-Hill argued that, under the three-year statute of limitations of the Copyright Act, 17 U.S.C. § 507(b), summary judgment should be granted as to any claims of copyright infringement that occurred before April 18, 2009.   GHPI filed a response on October 1, 2012, contending that summary judgment was not warranted because of disputes of material fact about whether GHPI knew or should have known of the extent of McGraw-Hill's copyright infringements (ECF 24).   McGraw-Hill filed a reply on October 15, 2012, reiterating that GHPI was on notice that McGraw-Hill had overrun licenses in 2006 (ECF 26).   On November 28, 2012, the Court issued a Memorandum (ECF 27) and Order (ECF 28) denying McGraw-Hill's motion, concluding that "a genuine dispute of material fact exists about whether and when GHPI should have discovered the alleged infringements that McGraw never disclosed." See Grant Heilman Photography, Inc. v. The McGraw-Hill Companies, Inc., No. 12-2061, 2012 WL 5944761, at *1 (E.D. Pa. Nov. 28, 2012).

On December 14, 2012, McGraw-Hill moved to bifurcate the litigation into two stages under Fed. R. Civ. P. 42(b), the first to consider the statute of limitations and the second to determine liability and damages (ECF 29).   GHPI opposed the motion to bifurcate (ECF 30). Following a hearing, the Court issued a Memorandum (ECF 35) and Order (ECF 36) on May 7, 2013, granting McGraw-Hill's motion in part and ordering a bifurcated bellwether trial based on 24 invoices selected by GHPI and six invoices selected by McGraw-Hill.   The Court concluded that a bellwether trial was warranted because of the possibility that the jury could find in favor of McGraw-Hill on the statute of limitations issue and in order to narrow the scope of discovery and conserve judicial resources.

On April 28, 2014, GHPI moved for partial summary judgment on 57 claims of copyright infringement for a number of reasons, including that McGraw-Hill could not establish its statute of limitations affirmative defense (ECF 104).   McGraw-Hill filed a response, arguing that genuine disputes of material fact existed regarding the statute of limitations (ECF 108).   GHPI replied (ECF 111), and McGraw-Hill filed a sur-reply (ECF 118).   Following a hearing on June 11, 2014, the Court issued a Memorandum (ECF 126) and Order (ECF 127) on June 26, 2014, denying GHPI's motion, concluding that GHPI failed to show any specific infringing uses by McGraw-Hill within three years prior to filing suit, and finding disputes of material fact existed regarding application of the statute of limitations.   But the Court invited GHPI to submit undisputed evidence showing that McGraw-Hill exceeded the scope of GHPI's licenses after April 18, 2009.

On July 8, 2014 GHPI filed an addendum to its motion for partial summary judgment, detailing evidence that McGraw-Hill exceeded the scope of GHPI's licenses after April 18, 2009 (ECF 128).   McGraw-Hill filed a supplemental brief on the statute of limitations issue, arguing

that disputes of material fact remained as to whether many of GHPI's claims were barred by the statute of limitations (ECF 131).   GHPI replied that the undisputed evidence showed McGraw-Hill committed infringements after April 18, 2009, and that McGraw-Hill had no statute of limitations defense to those infringements (ECF 137).   On August 6, 2014, the Court issued a Memorandum (ECF 139) and Order (ECF 140) granting in part GHPI's summary judgment motion for certain infringements committed after April 18, 2009, and denying GHPI's motion as to other claims.

On August 8, 2012, GHPI filed a motion for reconsideration, contending that the Court had committed certain errors of law in deciding GHPI's motion for partial summary judgment (ECF 145).   McGraw-Hill filed a response in opposition (ECF 152), and GHPI replied (ECF 153).   On September 5, 2014, the Court granted in part and denied in part GHPI's motion for reconsideration (ECF 157).   On September 10, 2014, the Court issued an Order granting in part and denying in part GHPI's motion for reconsideration (ECF 165).   The Court corrected certain minor errors in its prior Order but refused to revisit its prior rulings on McGraw-Hill's statute of limitations defense.

On September 15, 2014, the bellwether trial on 53 claims selected by the parties commenced.   Following a six-day trial, the jury returned a verdict on September 23, 2014, finding McGraw-Hill liable for copyright infringement.   <u>See</u> ECF 179.   The jury answered "no" to an interrogatory asking whether McGraw-Hill "has proven, by a preponderance of the evidence, that plaintiff knew of 'storm warnings' or was on 'inquiry notice' prior to April 18, 2009."   <u>See</u> <u>id.</u>, Interrogatory No. 5.   The jury also found that GHPI had "proven by a preponderance of the evidence that plaintiff had not discovered sufficient facts to bring a claim of infringement against

defendant as of April 18, 2009." See id., Interrogatory No. 8(a).   The jury found that "plaintiff discovered facts sufficient to file a claim against defendants" in October 2009.   See id., Interrogatory No. 8(b).   The jury found damages separately for the claims prior to and after April 18, 2009.   Accordingly, on September 24, 2014, judgment was entered in favor of GHPI and against McGraw-Hill in the amount of $127,087.00 (ECF 180).

Both parties have filed numerous post-trial motions.   On October 21, 2014, McGraw-Hill moved under Fed. R. Civ. P. 50(b) for judgment as a matter of law on the statute of limitations issue (ECF 192), and filed a memorandum in support on November 4, 2014 (ECF 195). McGraw-Hill contends it proved, by a preponderance of the evidence, that as a matter of law GHPI knew of "storm warnings" or was on "inquiry notice" before April 18, 2009, and that GHPI failed to prove, by a preponderance of the evidence, that it was reasonably diligent in investigating these "storm warnings."   On December 2, 2014, GHPI filed a response (ECF 211), arguing that the record contained substantial evidence to support the jury's finding that GHPI was not on inquiry notice of McGraw-Hill's widespread copyright infringements and that a reasonable jury could conclude that GHPI exercised reasonable diligence in investigating the alleged storm warnings. On December 22, 2014, McGraw-Hill filed a reply (ECF 216).   The Court held argument on these motions on February 12, 2015.   The Court will decide the McGraw-Hill Rule 50(b) Motion before considering any of the other post-trial motions.

### III. Factual Summary of Evidence at Trial

The undisputed evidence presented at trial shows that McGraw-Hill committed certain acts of copyright infringement before April 18, 2009, and that GHPI knew of these incidents.   The key questions are whether the evidence shows that these incidents were storm warnings or placed

GHPI on inquiry notice of McGraw-Hill's widespread use of GHPI's photographs beyond license limits and, if so, whether GHPI conducted a reasonably diligent investigation.

## A.  February 1995 Late Licensing

A McGraw-Hill division, William C. Brown, published a GHPI photo in the third edition of <u>Biology</u> by Raven & Johnson without an invoice or payment.   GHPI wrote to McGraw-Hill informing them of the use of the photo without payment.   <u>See</u> Defs.' Br., Ex. 15 at 6; Pl.'s Brief, Ex. 20; Trial Tr. 186:17-188:16, Sept. 15, 2014.   At trial, GHPI President Sonia Wasco acknowledged that the letter was "an indication that GHPI became aware there was unauthorized use of one of GHPI's photos" in the textbook.   Trial Tr. 188:13-16, Sept. 15, 2014.

## B.  Early 1999 Late Licensing

A McGraw-Hill division, Glencoe, published the 1998 edition of <u>Biology: Dynamics of Life</u> without obtaining permission for most of the photos in the book.   <u>Id.</u> 98:17-99:6, 192:3-13; Defs.' Br., Ex. 6.

Ms. Wasco was at the time serving as President of the Picture Archive Council of America ("PACA"), a trade association of stock photo agencies.   Trial Tr. 98:8-99:16, Sept. 15, 2014.   On April 8, 1999, an attorney sent a letter to McGraw-Hill on behalf of PACA members, including GHPI, asserting that McGraw-Hill's use of the members' images constituted copyright infringement.  Defs.' Br., Ex. 6.   In September 1999, McGraw-Hill sent GHPI a letter and a check for $8,046.25 to cover its use of 53 GHPI photos.   Trial. Tr. 195:18-197:8, Sept. 15, 2014; Defs.' Br. Ex. 26, 27.

Ms. Wasco returned the letter and check as unacceptable, and sent a letter identifying three other products associated with the book in which McGraw-Hill had also used GHPI images

without permission, enclosing invoices for three times the normal license fee as a penalty.   Trial Tr. 197:17-198:19; 211:3-21; 214:14-216:2, Sept. 15, 2014; Defs.' Br. Ex. 27, 29.   Ms. Wasco indicated she negotiated payment for this infringement for "the better party of a day" with a McGraw-Hill executive.   Trial. Tr. 100:13-101:16; 217:5-18, Sept. 15, 2014.   McGraw-Hill agreed to pay a two-times penalty.   Id. 216:3-12.

## C.  November 12, 1999 *Selling Stock* Article

On November 12, 1999, Ms. Wasco received an email from a GHPI photographer forwarding an article called "Infringement at Glencoe" that had appeared in the November 3, 1999 edition of *Selling Stock*, a stock photo industry newsletter published by Jim Pickerell.   Trial Tr. 13:14-16:18, Sept. 16, 2014; Defs.' Br. 8, 24.   The article discussed the failure of Glencoe to obtain photo permissions for Biology: Dynamics of Life and another textbook series, Science Voyages.   Defs.' Br. Ex. 8, 24.   The article labeled Glencoe's conduct "a pattern" and advised readers that, "You can no longer depend on this publisher—and maybe not any publisher—to tell you when they have published your work.   You can't wait to be notified. . . .   You can no longer trust the publisher to supply you with the information you need to properly invoice."   Trial Tr. 19:8-20, Sept. 16, 2014; Defs.' Br., Ex. 8, 24.

At trial, Ms. Wasco testified that she did not share Mr. Pickerell's opinion.   Trial Tr. 21:3-6, Sept. 16, 2014.   She also acknowledged that Mr. Pickerell did not "say anything about widespread massive over printing of, not just one or two books, but dozens or hundreds of books" or "use by over printing photographs beyond the license limits on a massive widespread basis by McGraw" and that she did not believe "there was massive widespread copyright infringement that was being committed by . . . McGraw Hill."   Trial Tr. 103:25-104:10, Sept. 15, 2014.

Ms. Wasco also noted that GHPI and McGraw-Hill "always resolved" issues of copyright infringement and the parties had a "longstanding trusting relationship." Trial Tr. 52:23-24, Sept. 15, 2014. Ms. Wasco testified that she felt she could trust McGraw-Hill to comply license limits. Id. 52:25-53:3.

**D.  November 1999 Late Licensing**

GHPI confirmed that McGraw-Hill used its photos in three of the Science Voyages textbooks without permission. Trial Tr. 23:17-26:23, Sept. 16, 2014; Defs.' Ex. 7, 13. Ms. Wasco testified that she believed these incidents were "something that slipped through the cracks, or was unusual, or was an oversight on the part of McGraw, rather than an ingrained systemic serial practice of McGraw-Hill to infringe." Trial Tr. 105:4-11, Sept. 15, 2014. She testified that "McGraw essentially cooperate[d] with [GHPI] in fixing this mistake concerning these two books, Science Voyages and Biology: Dynamics of Life in late 1999 and early 2000." Id. 101:24-102:22. McGraw Hill presented correspondence with GHPI resolving these issues in positive terms, discussing "working together in the future" to the jury. Id. 216:3-217:18; Pl.'s Br., Ex. 8, 9, 13, 25, 38, 39.

Ms. Wasco testified that she traveled to McGraw-Hill's Columbus, Ohio, offices in early 2000 and met with McGraw-Hill's permissions employees. At that meeting, "we talked about the problems that had occurred and developed what we felt was a good basic body of licensing and agreement for moving forward so that this would not happen in the future." Trial Tr. 102:8-12, Sept. 15, 2014. Ms. Wasco testified that she did not believe, "at that time, that there was widespread copyright infringement that McGraw was committing against Heilman Photographers in particular and other photographers in general," but "that as a result of the meeting in 2000 that

9

McGraw was a trustworthy partner, business partner and that [GHPI], going forward, would be able to rely upon them to get permissions for the uses they made and pay for them." Id. 102:13-22.

## E.  February 2004 Late Licensing

A McGraw-Hill Higher Education division freelancer sent an invoice request for the seventh edition of Biology by Raven & Johnson to GHPI, noting that a GHPI photograph was used without permission.   Trial Tr. 27:21-30:20, Sept. 16, 2015; Defs.' Br., Ex. 16.   The GHPI invoice listed a copyright year of 2003, even though the invoice had not been requested until 2004.   Defs.' Br., Ex. 16.   Ms. Wasco testified that an invoice request received after the book's copyright year would "raise a flag" for GHPI that the publisher had already made use of GHPI's photo without permission.   Trial Tr. 37:3-18, Sept. 16, 2014.   But Ms. Wasco did not recall that this particular invoice request "raised a flag."   Id. 37:19-22.

Ms. Wasco also acknowledged that, since at least May 2003, GHPI had a practice of asking for the book's copyright year and ISBN when each invoice was requested so as to determine whether it had already been published and, in such cases, charged an additional retroactive license fee for the infringement.   Id. 22:5-11; 152:6-153:12; Defs.' Br., Ex. 12. But the invoice GHPI issued for the seventh edition of Biology made no reference to a retroactive license fee.   Defs.' Br., Ex. 16.

## F.  August 2006 License Overruns

On August 15, 2006, Glencoe employee Heidi Kidwell sent a letter to GHPI enclosing a check for $39,433.10 for "usage in a print run larger than originally anticipated" in 16 separate invoices involving 10 publications.   Trial Tr. 44:25-45:20, Sept. 16, 2015; Defs.' Br., Ex. 9.

10

Ms. Wasco testified that, after receiving this letter, "We actually felt that they got it right. That, you know, they were bringing this to our attention and wanted to resolve the issues that were outstanding at the time, the overages, and wanted to take care of any of the problems that existed there and we were really pleased that they brought this to our attention so we could resolve it." Trial Tr. 108:23-109:3, Sept. 15, 2014.   Ms. Wasco noted that she did not think at the time that McGraw-Hill must be infringing lots of other GHPI works, but she "thought that . . . this was the problem, this is what had happened.   I did not think they were doing any other infringements." Id. 109:4-9.   Ms. Wasco testified she did not ask McGraw whether it infringed other books "because we assumed they were giving us all the – they had been cooperating with us on these, we thought, how great, they brought it to our attention, they wanted to make this right. We had no reason to believe that they were infringing any other titles."   Trial Tr. 62:16-21, Sept. 16, 2014.

On August 25, 2006, Ms. Wasco received an email from Robert Folz, the owner of Visuals Unlimited, Inc., another agency that did business with McGraw-Hill, sharing that he had received a check and an insufficient explanation from Glencoe.   Id. 45:21-47:7; 48:21-49:10; Defs.' Br., Ex. 11.   In her response, Ms. Wasco confirmed that GHPI had also received a check, and that she knew another agency had as well.   Trial Tr. 49:14-21; 51:22-25, Sept. 16, 2014; Defs.' Br., Ex. 11.   In addition, she told Mr. Folz that an attorney had contacted her several months ago and asked GHPI to join in an audit of publishing numbers at Houghton Mifflin Harcourt.   Ms. Wasco declined to join out of concern "of being blacklisted."   Defs.' Br., Ex. 11.   Ms. Wasco speculated that the attorney may have requested an audit of McGraw-Hill and that action may have caused

McGraw-Hill to send the overrun checks.   Trial Tr. 52:21-56:4, Sept. 16, 2014; Defs.' Br., Ex. 11.[1]

In October 2006, Ms. Wasco wrote a letter to Ms. Kidwell contending that McGraw-Hill owed additional amounts under the parties' pricing agreement for the 16 invoices that had been exceeded. Id. Ex. 2 at 56:21-57:6; id. Ex. 9 at 5.   McGraw-Hill agreed to pay the difference. Id. Ex. 2 at 62:24-63:12; id. Ex. 10.

On December 1, 2006, Ms. Kidwell wrote an email to Ms. Wasco notifying GHPI that the invoices for the overrun payments had been processed and thanking Ms. Wasco "for the time you and your staff took to provide such clear invoicing.   I appreciate this.   It made the evaluation process much simpler."   Defs.' Br., Ex. 10; Trial Tr. 62:24-63:12, Sept. 16, 2014; Trial Tr. 119:19-120:4, Sept. 17, 2014.

Ms. Wasco noted that GHPI and McGraw-Hill "amicably resolve[d]" the problem and that GHPI believed that it could trust McGraw-Hill going forward because they had disclosed this mistake.   Trial Tr. 110:13-16, Sept. 15, 2014.   She testified that McGraw-Hill was "very cooperative in dealing with this.   We thought they brought all of the problems to our attention.   I had no reason to believe that anything else existed."   Id. 110:18-20.   As a result Ms. Wasco testified that she felt no need to ask McGraw-Hill about any other invoice overruns at Glencoe or other McGraw-Hill divisions.   Trial Tr. 63:13-24; 64:24-65:22, Sept. 16, 2014.   She did not ask whether Glencoe had exceeded the invoice for Physics: Principles and Problems © 2002, one of the titles at issue in the bellwether trial, although GHPI received an overrun payment for the © 2005 edition of the same book.   Id. 61:22-62:23; Defs.' Br., Ex. 9.

_____

1  The attorney referenced in Ms. Wasco's email was Maurice Harmon, who was retained by GHPI in March 2007 and has represented GHPI in a series of copyright lawsuits against textbook publishers.   Trial Tr. 169:15-17, Sept. 15, 2014; Trial Tr. 52:21-53:1, Sept. 16, 2014.

Ms. Kidwell testified that there was nothing in her August 2006 letter to GHPI that would have informed GHPI that McGraw-Hill had infringed many other works besides those listed in the invoices identified in the letter.   Trial Tr.   114:5-16, Sept. 17, 2014.   Ms. Kidwell testified that her later December 2006 letter also did not include any warning to GHPI about many other copyright infringements McGraw-Hill had committed at the time it was sent.   Id. 119:19-120:4. Ms. Kidwell also acknowledged that neither she nor anyone else she knew at McGraw-Hill informed GHPI that GHPI should be aware that McGraw-Hill was committing numerous other infringements.   Id. 133:13-134:15.   But Ms. Kidwell also testified that because she worked for the Glencoe division, she thought it was clear that she did not speak for all of McGraw-Hill.   Id. 114:5-16.

Ms. Wasco testified that she was aware that number of other stock photo agencies received similar letters from McGraw-Hill in 2006, but that none of the other agencies brought a lawsuit against McGraw-Hill at that time.   Trial Tr. 113:18-114:10, Sept. 15, 2014.   Ms. Kidwell confirmed that McGraw-Hill was not sued by any agencies after it sent the 2006 overrun letters, and no agency accused McGraw-Hill of infringing other products.   Trial Tr. 91:3-92:21, Sept. 17, 2014; Pl.'s Br., Ex. 10.

Former GHPI employee Carroll Forry, whose deposition was read at trial, acknowledged that awareness of one instance of overuse would logically cause her to look more closely at that company for other instances of potential overuse.   Trial Tr. 16:2-5, Sept. 22, 2014.   Ms. Forry noted that she looked more closely at potential overuse by publishers after GHPI became aware of license overruns by Houghton Mifflin Harcourt in 2008.   Id. 16:6-16.

The evidence also includes correspondence between Ms. Kidwell and Mr. Folz in which Mr. Folz asked Ms. Kidwell "if safeguards have been put in place to prevent future violations of licensing terms," and Ms. Kidwell responded, in part, "Adjustments to licenses were made upon an internal verification process.   This process will continue for all products for which rights managed images are used.   Should a license increase be anticipated or required, Glencoe will contact sources."   Trial Tr. 208:10-209:21, Sept. 17, 2014; Pl.'s Br., Ex. 10.   Ms. Kidwell confirmed that Mr. Folz never required additional disclosures for particular licenses or photographs after that point and did not sue McGraw Hill for copyright infringement at that time. Trial Tr. 209:17-210:13, Sept. 17, 2014.

## G.  2007-2008 Late Licensing

There were five additional incidents of late licensing that occurred in 2007 and 2008. These incidents generally involved McGraw-Hill requesting an invoice and paying the invoice after publication of the textbook containing GHPI photos.   In four of these incidents, GHPI's invoices show that GHPI did not charge a retroactive license fee or penalty or indicate McGraw-Hill's use was without permission.

On January 31, 2007, a McGraw-Hill Higher Education Division freelancer requested an invoice for the eighth edition of <u>Biology</u> by Mason, listing the publication date as "January 2007." GHPI issued an invoice on April 27, 2007, and McGraw-Hill paid the invoice in full on July 6, 2007.   Trial Tr. 83:8-84:10, Sept. 16, 2014; Defs.' Br., Ex. 19.

On March 8, 2007, a McGraw-Hill SRA Division employee requested an invoice for <u>How Plants Live and Grow</u>, listing the publication date as March 1, 2007.   Trial Tr. 71:24-72:3, Sept. 16, 2014; Defs.' Br., Ex. 17.   McGraw paid for the first use of an image in that book prior to using

14

it in December 2006, but only disclosed later that it had used the image twice.  Trial Tr. 72:24-77:14, Sept. 16, 2014; Defs.' Br., Ex. 17.   GHPI issued an invoice on May 19, 2007, and McGraw-Hill paid the invoice on June 15, 2007.   Trial Tr. 72:4-9; 77:10-14, Sept. 16, 2014; Defs.' Br., Ex. 17.

On April 24, 2007, the same SRA employee requested invoices for a series of reading books, listing the publication date at March 1, 2007.   Trial Tr. 85:2-86:3, Sept. 16, 2014; Defs.' Br., Ex. 18.   GHPI issued invoices the same day, and McGraw-Hill paid them on July 17, 2007. Trial Tr. 89:5-90:14, Sept. 16, 2014; Defs.' Br., Ex. 18.

On July 10, 2008, in response to an invoice request for <u>Mathematics: Concepts, Skills, and Problem Solving</u> from McGraw-Hill's School Education Group, Ms. Forry responded by email, "[W]e understand this book was published in 2006 and that is when the high res was requested.   Is this the first printing for this title?"   Trial Tr 106:8-16, Sept. 16, 2014; Defs.' Br., Ex. 20.   At trial, Ms. Wasco admitted that this email showed GHPI knew the book was already on the market at the time, meaning that McGraw-Hill had used GHPI's photo without permission, but the resulting invoice did not indicate that it was retroactive or include a penalty fee.   Trial Tr. 106:8-16; 107:3-8, 19-21, Sept. 16, 2014; Defs.' Br. Ex. 20.

McGraw-Hill did charge a retroactive license fee in one instance.   Upon receiving an invoice request on November 4, 2008 from a McGraw-Hill freelancer, David Tietz, for re-use of photos in the sixth edition of <u>The Living World</u>, GHPI reviewed its records and discovered that it had never issued an invoice for the use of one photo in the fifth edition of that book.   Trial Tr. 90:15-93:2; 95:13-23, Sept. 16, 2014; Defs.' Br., Ex. 14.   Mr. Tietz confirmed that the photo had been used in the fifth edition and inadvertently had not been paid for.   Trial Tr. 96:10-19; Sept. 15,

2014; Trial Tr. 178:4-179:5, Sept. 18, 2014; Defs.' Br., Ex. 14.   GHPI's invoice charged a "retroactive license fee for image published and distributed without permission," which Ms. Wasco understood as "an assertion of infringement."   Trial Tr. 97:10-98:2, Sept. 16, 2014; Defs.' Br., Ex. 14.

## H.  April 15, 2009 License Overrun

On April 15, 2009, just over three years before this lawsuit was filed, Ms. Wasco received an email from McGraw-Hill employee Mike Conner attaching an invoice request for images licensed for the 2004 edition of <u>Health and Wellness</u>, Grade 3.   Trial Tr. 111:19-112:18, Sept. 16, 2014; Defs.' Br., Ex. 22.   The invoice request listed the book's ISBN and copyright year of 2004 and requested a print run of up to 500,000.   Trial Tr. 113:2-24, Sept. 16, 2014; Defs.' Br., Ex. 22. GHPI had previously invoiced the same book for a print run of only 60,000.   Trial Tr. 113:14-24; 114:19-115:8, Sept. 16, 2014; Defs.' Br., Ex. 22.   Based on this information, Ms. Wasco testified that she was "suspicious" the invoice had been exceeded, so she forwarded the invoice request to her attorney, Mr. Harmon, on April 16, 2009.   Trial Tr. 176:4-19, Sept. 16, 2014; Defs.' Br., Ex. 25.

Grant Heilman, GHPI's founder, had filed a class action lawsuit against publisher Houghton Mifflin Harcourt for invoice overruns in 2008, and Ms. Forry stated in her deposition that the lawsuit caused GHPI to "become more curious if other publishers were doing the same thing."   Trial Tr. 171:7-11, Sept. 15, 2014; Trial Tr. 12:16-13:3, 13:17-25, Sept. 22, 2014.   By April 16, 2009, when Ms. Wasco forwarded the email about <u>Health and Wellness</u> to Mr. Harmon, they "were already discussing other lawsuits with other publishers."   Trial Tr. 176:20-23, Sept. 16, 2014.

16

On April 16, 2009, Ms. Forry wrote back to Mr. Conner with a series of questions, to which he responded on the same day.   Trial Tr. 114:17-115:22, Sept. 16, 2014; Defs.' Br., Ex. 22, 23. Ms. Forry first asked whether the invoice request was meant to extend the original print run of 60,000 for the 2004 edition to 500,000, and Mr. Conner confirmed that it was.   Defs.' Br., Ex. 22, 23.   "If you are just extending the print run," Ms. Forry next asked, "how many copies over 60,000 have been printed since 2004."   Id.   Mr. Conner responded: "That's hard to [s]ay, but the total run will be up to 500,000 for 8 years from 2004 until 2012."   Id.   Later that day, Ms. Forry wrote back with a follow-up question:   "At what date did the quantity exceed 60,000[?]"   Defs.' Br., Ex. 22.   This time, Mr. Conner did not respond to her question.   Id.

Mr. Conner's supervisor, Merilynne Cohen, wrote to Ms. Forry on May 18, 2009 and provided the total print run figures for each grade of Health and Wellness.   Trial Tr. 118:19-120:23, Sept. 16, 2014; Defs.' Br., Ex. 22.   In response, GHPI issued invoices charging a ten-times retroactive fee for the use of each photo in Health and Wellness, amounting to $64,400 for four photos.   Trial Tr. 121:13-122:25, Sept. 16, 2014; Defs.' Br., Ex. 22.   In emails sent on July 13, 2009 and October 28, 2009, Ms. Cohen told Ms. Forry that McGraw-Hill would not agree to pay the ten-times penalty because it was contrary to the parties' pricing agreement.   Trial Tr. 174:4-20, Sept. 19, 2014; Defs.' Br., Ex. 22.   After each of those refusals to pay the ten-times penalty, Ms. Forry warned that GHPI would be turning the matter over to its attorney.   Trial Tr. 166:3-167:1, Sept. 16, 2014; Defs.' Br., Ex. 22.

On July 1, 2010, GHPI's counsel contacted McGraw-Hill and to discuss possible legal action if McGraw-Hill refused to pay the invoices.   Trial Tr. 167:2-4, Sept. 16, 2014; Defs.' Br., Ex. 21.

Ms. Wasco testified that, despite the instances of "late licensing" and two instances of print overruns, GHPI did not think that it should run into court and sue McGraw for all of the images that GHPI licensed to them "[b]ecause we were always able to work out an agreement and resolve the issue and license the images correctly."  Trial Tr. 117:13-24, Sept. 15, 2014.  Ms. Wasco further testified that McGraw-Hill "always answered all of our questions" about how they had used the images GHPI had licensed to them.  Id. 117:25-118:6.

Rachel Norton, Director of Publishing Operations at the McGraw-Hill School Group, testified that McGraw-Hill did not know that it had exceeded the limits of the licenses at issue in the bellwether trial until it researched them in 2013 while responding to GHPI's discovery requests.  Trial Tr. 106:14-19, Sept. 18, 2014.  Ms. Norton agreed that "surely Heilman Photography would not have known until 2013 of these infringements" because McGraw-Hill "didn't communicate that we were over prior to that, so I think that answer's no."  Id. 106:20-23.

This evidence shows that GHPI was aware of incidents of copyright infringement committed by McGraw-Hill over the course of the parties' relationship.  The key question, however, is whether knowledge of these incidents was sufficient to put GHPI on inquiry notice of McGraw-Hill widespread license overruns as a matter of law.

## IV. Analysis

### A.  Inquiry Notice Test and the Objectively Reasonable Standard

#### 1.  Inquiry Notice Test

The Copyright Act imposes a three-year statute of limitations on suits for copyright infringement.  17 U.S.C. § 507(b).  GHPI filed suit against McGraw-Hill on April 18, 2012, meaning that any acts of infringement occurring before April 18, 2009, would be untimely unless

the running of the statute of limitations was tolled.   The Third Circuit has adopted the discovery rule in cases of copyright infringement, under which the running of the statute of limitations is tolled until "the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim."   See William A. Graham Co. v. Haughey ("Graham I"), 568 F.3d 425, 438 (3d Cir. 2009).[2]

In applying this rule to the statute of limitations in copyright cases in Graham I, the Third Circuit adopted a two-part test for determining when a plaintiff will be deemed on inquiry notice that the court had previously used in securities fraud and civil RICO actions.   See In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1325-26 (3d Cir. 2002) (securities fraud); Mathews v. Kidder, Peabody & Co., Inc., 260 F.3d 239, 251-52 (3d Cir. 2001) (civil RICO) ("[W]e hold that a plaintiff is on inquiry notice whenever circumstances exist that would lead a reasonable investor of ordinary intelligence, though the exercise of reasonable due diligence, to discover his or her injury.").   In the copyright context, the district court should examine whether a plaintiff "should have known the basis for [its] claims[, which] depends on whether [it] had sufficient information of possible wrongdoing to place [it] on inquiry notice or to excite storm warnings of culpable activity."   Graham I, 568 F.3d at 438 (internal quotation marks and citations omitted) (alterations in original).

Under this two-part test, McGraw-Hill first bears the burden of demonstrating the existence of "storm warnings."   Id.   "The test for 'storm warnings' is an objective one, based on whether a 'reasonable investor of ordinary intelligence would have discovered the information and

---

2 Although Graham I held that the discovery rule delays accrual of a cause of action, the Third Circuit later held in a subsequent appeal that the discovery rule "toll[s] the running of the limitations period after a cause of action has accrued."   William A. Graham Co. v. Haughey ("Graham II"), 646 F.3d 138, 150 (3d Cir. 2011).

recognized it as a storm warning.'"   In re NAHC, 306 F.3d at 1325 (quoting Mathews, 260 F.3d at 252).

If McGraw-Hill meets the burden of showing the existence of storm warnings, then the burden shifts to GHPI "to show that [it] exercised reasonable due diligence and yet [was] unable to discover [its] injuries."   Graham I, 568 F.3d at 438 (citation omitted) (alternations in original). "Whether the plaintiffs exercised reasonable due diligence is both a subjective and objective inquiry."   Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P., 435 F.3d 396, 401 (3d Cir. 2006) (citation omitted).   Plaintiffs must first show that they investigated the suspicious circumstances.   Mathews, 260 F.3d at 252. Then, the court "must determine whether their efforts were adequate—i.e., whether they exercised the due diligence expected of reasonable investors of ordinary intelligence."   Id.   "If they have not shown such diligence, the knowledge they would have acquired through investigation is imputed to them."   Benak, 435 F.3d at 401 (citing In re NAHC, 306 F.3d at 1326).

### 2.   Objectively Reasonable Standard

The Third Circuit has established that the test for storm warnings, the first prong of the inquiry notice analysis, is an objectively reasonable inquiry.   The Court notes that the objectively reasonable standard is used in numerous other areas of law and incorporates two elements. "Objective" means evaluating a set of facts from the perspective of a detached, dispassionate observer, not from the subjective perspective of the individual involved in the case.   See, e.g., Heien v. North Carolina, 135 S. Ct. 530, 539 (2014) ("The Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes . . . must be *objectively* reasonable.   We do not examine the subjective understanding of the particular officer involved." (citation omitted)).

"Reasonable" means analyzing a set of facts from the perspective of a hypothetical reasonable person.  Id. at 536.   As the Supreme Court recently noted in the Fourth Amendment search and seizure context:

> As the text indicates and we have repeatedly affirmed, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'"   Riley v. California, 573 U.S. ——, –——, 134 S. Ct. 2473, 2482, 189 L. Ed.2d 430 (2014) (some internal quotation marks omitted).   To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them "fair leeway for enforcing the law in the community's protection."   Brinegar v. United States, 338 U.S. 160, 176, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949).   We have recognized that searches and seizures based on mistakes of fact can be reasonable.   The warrantless search of a home, for instance, is reasonable if undertaken with the consent of a resident, and remains lawful when officers obtain the consent of someone who reasonably appears to be but is not in fact a resident.   See Illinois v. Rodriguez, 497 U.S. 177, 183–186, 110 S. Ct. 2793, 111 L. Ed.2d 148 (1990).   By the same token, if officers with probable cause to arrest a suspect mistakenly arrest an individual matching the suspect's description, neither the seizure nor an accompanying search of the arrestee would be unlawful.   See Hill v. California, 401 U.S. 797, 802–805, 91 S. Ct. 1106, 28 L. Ed.2d 484 (1971).   The limit is that "the mistakes must be those of reasonable men."   Brinegar, supra, at 176, 69 S. Ct. 1302.

Heien, 135 S. Ct. at 536.

Heien involved the question of whether a search and seizure based on a reasonable mistake of law under the Fourth Amendment was permissible.   An officer stopped a vehicle because one of its two brake lights was out, but a court later determined that the law required only one working brake light.   The Supreme Court determined that the officer's mistake of law was objectively reasonable, providing the reasonable suspicion necessary to make the stop valid under the Fourth Amendment.   Id. at 534.

There are other areas of Fourth Amendment search and seizure law in which the objectively reasonable standard applies.   For instance, the Fourth Amendment's exclusionary rule will not apply to evidence obtained by officers acting in objectively reasonable reliance on a

magistrate's probable-cause determination, even if the search warrant is later found to be defective.   United States v. Leon, 468 U.S. 897, 922 (1984).   The Supreme Court noted that "our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the circumstances—including whether the warrant application had previously been rejected by a different magistrate—may be considered."   Id. at n.23.   The Court extended this "good faith exception" to other contexts, such as searches conducted in objectively reasonable reliance on binding appellate precedent.   Davis v. United States, 131 S. Ct. 2419, 2423-24 (2011); see also United States v. Katzin, 769 F.3d 163, 176 (3d Cir. 2014) (en banc) ("Davis' inquiry involves a holistic examination of whether a reasonable officer would believe in good faith that binding appellate precedent authorized certain conduct, which is a scenario-specific way of asking the broader question of whether the officer act[ed] with an objectively 'reasonable good-faith belief' that [his] conduct [was] lawful." (internal quotation marks and citations omitted) (alterations in original)).

The objectively reasonable standard has also been applied in determining when a police officer's use of force becomes excessive under the Fourth Amendment.   See Graham v. Connor, 490 U.S. 386, 396 (1989).   In Graham, the Court noted that "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."   Id.   The Court held that the "reasonableness" of a use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."   Id.   "Objective," the Court held, meant

that "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397.

The Fourth Amendment standard of objective reasonableness also arises frequently in cases of qualified immunity involving searches or excessive force.  In inquiring whether a government official violated clearly established law in a search and seizure case, the Supreme Court has held that this inquiry "turns on the objective reasonableness of the action, assessed in the light of the legal rules that were clearly established at the time it was taken." Pearson v. Callahan, 555 U.S. 223, 244 (2009) (internal quotation marks and citations omitted); see also Curley v. Klem, 499 F.3d 199, 206-07 (3d Cir. 2007) (applying objectively reasonable standard in affirming grant of qualified immunity to officer in excessive force case).

The objectively reasonable standard has also been applied in asylum cases.  The federal asylum statute confers discretion on the Attorney General to grant asylum to a "refugee." 8 U.S.C. § 1158(b)(1).   A "refugee" is defined as an alien "who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . ." Id. § 1101(a)(42)(A).  The determination of whether an alien has a well-founded fear of persecution has a subjective and objective component. Abdille v. Ashcroft, 242 F.3d 477, 495-96 (3d Cir. 2001).   "The alien must show that he has a subjective fear of persecution that is supported by objective evidence that persecution is a reasonable possibility." Id. at 496 (internal quotation marks and citation omitted).   The objectively reasonable part of this standard requires the alien to produce objective evidence that a

23

reasonable person in the alien's circumstances would also fear persecution. <u>Id.</u>; <u>see also</u> <u>Lukwago v. Ashcroft</u>, 329 F.3d 157, 175 (3d Cir. 2003) (noting that the alien "has the burden of showing that the record would compel a reasonable adjudicator to find that he has a well-founded fear of persecution based on an enumerated ground").

GHPI also notes several decisions in which courts have concluded that the objectively reasonable standard for copyright infringement must be based on what a reasonable person in the plaintiff's position would have perceived. <u>See, e.g.</u>, <u>Warren Freedenfeld Assocs, Inc. v. McTigue</u>, 531 F.3d 38, 44 (1st Cir. 2008). The <u>McTigue</u> court noted that "determining when a reasonable person would have been aware of copyright infringement is a fact-sensitive enterprise" requiring a court to "explore the idiosyncratic circumstances of each individual case." <u>Id.</u> In a recent case deciding that the federal Vaccine Act did not adopt the discovery rule, the Federal Circuit noted that the discovery rule depends on "the knowledge of the plaintiff or a reasonable actor in the plaintiff's position." <u>Cloer v. Sec'y of Health & Human Servs.</u>, 654 F.3d 1322, 1340 (Fed. Cir. 2011) (en banc). The Court described the discovery rule as "inherently personal, plaintiff-specific" and noted that the rule "treats different plaintiffs differently based on their personal circumstances." <u>Id.</u> (citation omitted). The Eighth Circuit has also indicated that application of the discovery rule requires consideration of a reasonable person in plaintiff's position. <u>Comcast of Ill. X v. Multi-Vision Elec., Inc.</u>, 491 F.3d 938, 944 (8th Cir. 2007) ("The pertinent issue here is whether the publication of the <u>Imperial Empire</u> decision would have led a reasonable person in [plaintiff's] position to investigate the possibility that its rights were being violated." (citation omitted)). However, the Third Circuit has not employed this specific language in any of its precedential opinions defining the "objectively reasonable" standard.

In denying summary judgment to McGraw-Hill in a case very similar to this one, a district court, relying in part on this Court's decision in <u>Grant Heilman</u>, 2012 WL 5944761, applied the objectively reasonable standard from the standpoint of a reasonable person in plaintiff's position, concluding that "a rational interpretation of McGraw's 2006 payment is that McGraw was *not* concealing its print overruns." <u>DRK Photo v. The McGraw-Hill Cos.</u>, No. 12-8093, 2013 WL 1151497, at *2 (D. Ariz. Mar. 19, 2013). Other district courts have similarly considered the objectively reasonable standard from the viewpoint of a reasonable person in plaintiff's position. <u>See, e.g.</u>, <u>Leventhal v. Schenberg</u>, 917 F. Supp. 2d 837, 845 (N.D. Ill. 2013) (noting that the three-year copyright statute of limitations begins to run "from the date when a reasonable person in the plaintiff's position would have discovered the infringement" (internal quotation marks and citation omitted)); <u>Garcia v. Coleman</u>, No. 07-2279, 2008 WL 4166854, at *6 (N.D. Cal. Sept. 8, 2008) ("Whether a plaintiff's lack of knowledge was reasonable takes into account what a reasonable copyrightholder in the plaintiff's position would have known." (citations omitted)); <u>Beidleman v. Random House, Inc.</u>, 621 F. Supp. 2d 1130, 1134 (D. Colo. 2008) ("Determination of the accrual date according to the discovery rule requires consideration of 'when a reasonably prudent person in the plaintiff's shoes would have discovered . . . the putative infringement.'" (quoting <u>McTigue</u>, 531 F.3d at 44)). The Court does not explicitly adopt the language of these cases.

## B. GHPI President Wasco's Trial Testimony

Whether GHPI was on inquiry notice prior to April 18, 2009, is a close question. McGraw-Hill argues that, in light of Ms. Wasco's testimony, an objectively reasonable copyright holder would have recognized McGraw-Hill's repeated copyright infringements between 1995

and 2009 as storm warnings.   In McGraw-Hill's view, the jury's verdict that McGraw-Hill had not met its burden of demonstrating storm warnings—the first prong of the inquiry notice test under Graham I—was against the weight of the evidence.   Because the jury found McGraw-Hill had not met its burden of demonstrating storm warnings, it never reached the second prong of the inquiry notice test under Graham I—whether GHPI met its burden of showing that it exercised reasonable due diligence but was unable to discover its injuries.   McGraw-Hill contends that GHPI cannot meet this burden because GHPI conducted no investigation into the extent of McGraw-Hill's copyright infringement, let alone a reasonably diligent inquiry.   Furthermore, McGraw-Hill argues that GHPI never exercised the provision in GHPI's invoices permitting GHPI to request an accounting of McGraw-Hill's usage of GHPI photos, as well as two free copies of all McGraw-Hill publications in which GHPI photos were used.

Evaluating Ms. Wasco's testimony in isolation, McGraw-Hill has a strong argument that GHPI was on inquiry notice.   The evidence detailed above shows that McGraw-Hill committed numerous acts of copyright infringement between 1995 and 2009 of which GHPI was aware, including instances of late licensing and license overruns.   An objectively reasonable copyright holder arguably would have regarded these incidents as storm warnings heralding possibly greater infringement than McGraw-Hill had disclosed.   McGraw-Hill presented evidence that Jim Pickerell, publisher of the industry newsletter *Selling Stock*, interpreted the late licensing by McGraw-Hill's Glencoe Division in this way—as a symptom of a larger problem.   In his November 3, 1999, article "Infringement at Glencoe," which Ms. Wasco read, Mr. Pickerell labeled the problems at Glencoe a "pattern" and noted that stock agencies could "no longer depend" on McGraw-Hill to "tell you when they have published your work."   Trial Tr. 19:8-20,

Sept. 16, 2014; Defs.' Br. Ex. 8, 24.   Mr. Pickerell advised stock agencies that they could "no longer trust the publisher to supply you with the information you need to properly invoice."   Id.

Yet despite these repeated incidents of infringement, Ms. Wasco testified that she continued to regard McGraw-Hill as a trustworthy partner.   For instance, with regard to the 1999 late licensing by McGraw-Hill's Glencoe Division of the 1998 edition of <u>Biology: Dynamics of Life</u> and <u>Science Voyages</u>—the incidents discussed by Mr. Pickerell's article—Ms. Wasco offered the following testimony at trial:

- She described these incidents as "something that slipped through the cracks, or was unusual, or was an oversight on the part of McGraw, rather than an ingrained systemic serial practice of McGraw-Hill's to infringe."   Trial Tr. 105:4-11, Sept. 15, 2014.

- She felt that she could trust McGraw-Hill to comply with license limits because GHPI and McGraw-Hill "always resolved" issues of copyright infringement and the parties had a "longstanding trusting relationship."   Trial. Tr. 52:23-53:3, Sept. 15, 2014.

- She testified that she did not believe, "at that time, that there was widespread copyright infringement that McGraw was committing against Heilman Photographers in particular and other photographers in general," but "that as a result of the meeting in 2000 that McGraw was a trustworthy partner, business partner and that [GHPI], going forward, would be able to rely upon them to get permissions for the uses they made and pay for them."   Trial Tr. 102:13-22, Sept. 15, 2014.

- With regard to Mr. Pickerell's article, Ms. Wasco testified that she did not share his opinion and that Mr. Pickerell did not "say anything about widespread massive over printing of, not just one or two books, but dozens or hundreds of books" or "use by over printing photographs beyond the license limits on a massive widespread basis by McGraw" and that she did not believe "there was massive widespread copyright infringement that was being committed."   Trial Tr. 103:25-104:10, Sept. 15, 2014; 21:3-6, Sept. 16, 2014

Ms. Wasco also testified extensively about the August 2006 discovery of license overruns by Glencoe, which involved 16 separate invoices for 10 publications.   Glencoe sent a letter with a check for $39,433.10 to GHPI to cover the overruns.   Ms. Wasco's testimony indicated that she once again trusted McGraw-Hill and did not suspect additional infringements:

- After receiving the letter, Ms. Wasco testified that GHPI "felt that they got it right. That . . . they were bringing this to our attention and wanted to resolve the issues that were outstanding at the time, the overages, and wanted to take care of any of the problems that existed there and we were really pleased that they brought this to our attention so we could resolve it."   Trial Tr. 108:23-109:3, Sept. 15, 2014.

- Ms. Wasco testified that she did not think at the time that McGraw-Hill must be infringing lots of other GHPI works, but she "thought that . . . this was the problem, this is what happened.  I did not think they were doing any other infringements."   Id. 109:4-9.  She did not ask McGraw-Hill whether it had committed other infringements "because we assumed they were giving us all the – they had been cooperating with us on these, we thought, how great, they brought it to our attention, they wanted to make this right.  We had not reason to believe that they were infringing any other titles." Trial Tr. 62:16-21, Sept. 16, 2014.

- Ms. Wasco testified that she was aware that a number of other stock photography agencies received similar letters and overrun checks from McGraw-Hill in 2006.   Trial Tr. 113:18-114:10, Sept. 15, 2014.

- In communicating with Mr. Folz, the owner of another stock agency who had received a similar letter and check from Glencoe, Ms. Wasco told him she had declined to join an audit of publishing numbers at Houghton Mifflin Harcourt being conducted by Mr. Harmon out of concern "of being blacklisted."  Defs.' Br., Ex. 11.  She speculated that the overrun checks may have been sent because Mr. Harmon requested an audit of McGraw-Hill.

There was also extensive evidence presented at trial about the April 15, 2009, invoice request from McGraw-Hill that that caused Ms. Wasco to become "suspicious" that McGraw-Hill had exceeded the license for the 2004 edition of Health and Wellness, Grade 3 and to forward the invoice request to Mr. Harmon.   Trial Tr. 176:4-19, Sept. 16, 2014; Defs.' Br., Ex. 25.   GHPI had filed suit against Houghton Mifflin Harcourt for invoice overruns in 2008, and former GHPI employee Carroll Forry testified that this lawsuit caused GHPI to "become more curious if other publishers were doing the same thing."  Trial Tr. 17:1-11, Sept. 15, 2014; Trial Tr. 12:16-13:3, 13:17-25, Sept. 22, 2014.   Despite the instances of late licensing and license overruns, Ms. Wasco still trusted McGraw-Hill.   She testified that GHPI did not think it should run into court and sue

McGraw-Hill for all of the images GHPI licensed to them "[b]ecause we were always able to work out an agreement and resolve the issue and license the images correctly."   Trial Tr. 117:13-24, Sept. 15, 2014.   Ms. Wasco further testified that McGraw-Hill "always answered all of our questions" about how they had used the images GHPI had licensed to them.   Id. 117:25-118:6.

Considering Ms. Wasco's testimony alone, it would be difficult to conclude that, from an objectively reasonable perspective, GHPI was not aware of storm warnings prior to April 18, 2009.

## C.  Judgment as a Matter of Law

Although Ms. Wasco's testimony, viewed in isolation, supports McGraw-Hill's contention that a reasonably objective copyright holder would have been aware of storm warnings before April 18, 2009, the Court is mindful that Fed. R. Civ. P. 50 reflects a strong policy not to overturn jury verdicts.   Under Fed. R. Civ. P. 50, judgment as a matter of law may be granted post-trial if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-moving] party on that issue."   Courts should grant motions for judgment as a matter of law "sparingly."   Pitts v. Delaware, 646 F.3d 151, 155 (3d Cir. 2011).

When evaluating a Rule 50(b) motion for judgment as a matter of law, a court must consider the evidence "in the light most favorable to the non-movant and giving it the advantage of every fair and reasonable inference."   Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993).   "[T]he court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version."   Id.   "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party."   Id. (quoting Patzig v. O'Neil, 577 F.2d 841, 846 (3d Cir. 1978)).

With agreement of counsel, the Court submitted the question of whether GHPI was on inquiry notice before April 18, 2009 to the jury and instructed the jury on the objectively reasonable standard for inquiry notice as set forth in Graham I.   Also by agreement, the Court included interrogatories to the jury on the issue of whether GHPI was on inquiry notice.   The jury answered "no" to an interrogatory asking whether McGraw-Hill "has proven, by a preponderance of the evidence, that plaintiff knew of 'storm warnings' or was on 'inquiry notice' prior to April 18, 2009.   See ECF 179, Interrogatory No. 5.   Because the jury concluded that McGraw-Hill had not met its burden of proving that GHPI knew of storm warnings, it never reached the second part of the Third Circuit's inquiry notice test—the jury interrogatories, submitted with agreement of counsel, did not require the jury to determine whether GHPI proved that it was reasonably diligent in investigating those storm warnings.   The jury also found that GHPI had "proven by a preponderance of the evidence that plaintiff had not discovered sufficient facts to bring a claim of infringement against defendant as of April 18, 2009.   See id., Interrogatory No. 8(a)).   The jury found that "plaintiff discovered facts sufficient to file a claim against defendants" in October 2009. See id., Interrogatory No. 8(b).

The Court instructed the jury to use the objectively reasonable standard as set forth in Graham I, and the Court must assume that the jury used that standard.   In light of the jury verdict, the Court must evaluate, viewing the evidence in the light most favorable to GHPI, "whether there is evidence upon which the jury could properly find a verdict for" GHPI.   See Lightning Lube, 4 F.3d at 1166 (quoting Patzig, 577 F.2d at 846).

**D.  Other Evidence Presented at Trial**

Although the testimony of Ms. Wasco, taken in isolation, may appear contrary to the jury's finding that McGraw-Hill failed to meet is burden of showing GHPI was aware of storm warnings, other evidence presented at trial regarding McGraw-Hill's knowledge of the infringements and the relationship between McGraw-Hill and GHPI supports the jury's verdict.

First, there was evidence presented at trial that McGraw-Hill was unaware of the extent of its license overruns until 2013.  Rachel Norton, Director of Publishing Operations at the McGraw-Hill School Group, testified that McGraw-Hill did not know that it had exceeded the limits of the licenses at issue in the bellwether trial until it researched them in 2013 while responding to GHPI's discovery requests.  Trial Tr. 106:14-19, Sept. 18, 2014.  Ms. Norton agreed that "surely Heilman Photography would not have known until 2013 of these infringements" because McGraw-Hill "didn't communicate that we were over prior to that, so I think the answer's no."  Id. 106:20-23.  If McGraw-Hill was unaware of the license overruns until 2013, the jury may have concluded that it could not find that GHPI was on inquiry notice of those infringements before April 18, 2009.

Second, the evidence at trial showed that multiple divisions at McGraw-Hill were involved in copyright infringements, that McGraw-Hill's records were not well organized, and that any questions or objections by an author or photographer (and by implication, Ms. Wasco) would not have resulted in any concrete information from McGraw-Hill.  For instance, the 1999 late licensing and the August 2006 invoice overruns involved McGraw-Hill's Glencoe Division, the 2004 late licensing involved the McGraw-Hill Higher Education Division, and the 2007-2008 late licensing involved the Higher Education Division, SRA, and School Education Group.  Ms.

Kidwell testified at trial that she had a difficult time uncovering the overruns she discovered in 2006 because McGraw-Hill did a poor job of maintaining records.   It is also clear that freelancers often were assigned to obtain photo permissions.

Ms. Kidwell also testified that there was nothing in her August 2006 letter to GHPI that would have informed GHPI that McGraw-Hill had infringed many other works besides those listed in the invoices identified in the letter.   Trial Tr. 114:5-16, Sept. 17, 2014.   Ms. Kidwell testified that her later December 2006 letter also did not include any warning to GHPI about many other copyright infringements McGraw-Hill had committed at the time it was sent.   Id. 119:19-120:4. Ms. Kidwell also acknowledged that neither she nor anyone else she knew at McGraw-Hill informed GHPI that GHPI should be aware of numerous other infringements by McGraw-Hill. Id. 133:13-134:15.   But Ms. Kidwell also testified that because she worked for the Glencoe division, she thought it was clear she didn't speak for all of McGraw-Hill.   Id. 114:5-16.   The jury may have concluded that this was not clear to GHPI.

Furthermore, the evidence also includes correspondence between Ms. Kidwell and Mr. Folz regarding the August 2006 overruns in which Mr. Folz asked Ms. Kidwell "if safeguards have been put in place to prevent future violations of licensing terms," and Ms. Kidwell responded, in part, "Adjustments to licenses were made upon an internal verification process.   This process will continue for all products for which rights managed images are used.   Should a license increase be anticipated or required, Glencoe will contact sources."   Trial Tr. 208:10-209:21, Sept. 17, 2014; Pl.'s Br., Ex. 10.   Ms. Kidwell confirmed that Mr. Folz never required additional disclosures for particular licenses or photographs after that point and did not sue McGraw-Hill for copyright

infringement at that time.   Trial Tr. 209:17-210:13, Sept. 17, 2014.   The jury may have concluded that any efforts by GHPI to pursue an inquiry would have been futile.

Third, there is ample testimony as to a course of dealing, if not a custom, pursuant to which photographers would submit their works to McGraw-Hill, and McGraw-Hill would use them as it saw fit, without any strict deadlines as to licensing, notice, or payment to the copyright holder.[3] Often McGraw-Hill would license the photograph, provide an invoice, and pay the copyright holder before using the photograph.   Sometimes, however, McGraw-Hill would use the photograph first and then perform an audit or accounting of its past uses, licensing, and payments, either itself or through freelancers.   When it was discovered that McGraw-Hill had used a photograph without a license or payment, McGraw-Hill would request an invoice from the copyright holder and generally pay it, with or without a penalty.   This system seemed to work fine for both McGraw-Hill and GHPI, as reflected in Ms. Wasco's testimony.

This system also seemed to work fine for McGraw-Hill and other stock photography agencies.   For instance, the evidence indicates numerous other stock agencies received a similar letter and payment from McGraw-Hill following the discovery of invoice overruns in August 2006.   None of the other agencies brought a lawsuit against McGraw-Hill at that time.   Trial Tr. 113:18-114:10, Sept. 15, 2014.   Ms. Kidwell testified that McGraw-Hill was not sued by any agencies after it sent these 2006 overrun letters, and no agency accused McGraw Hill of infringing in other products.   Trial Tr. 91:3-92:21, Sept. 17, 2014; Pl.'s Br., Ex. 10.   In light of this

---

3 Although the parties expressly indicated they were not making a course of dealing argument, and thus the Court did not charge the jury on the concept, the evidence presented at trial showed a course of dealing between the parties, and such evidence may have been considered by the jury in determining whether GHPI was on inquiry notice.   See, e.g., Kunststoffwerk Albert Huber v. R.J. Dick, Inc., 621 F.2d 560, 564 (3d Cir. 1980) (holding that under the U.C.C. "a course of dealing is a circumstance that may establish [a contract] term as part of the bargain of the parties in fact"); Ebasco Servs, Inc. v. Pa. Power & Light Co., 460 F. Supp. 163, 208 (E.D. Pa. 1978) (considering the course of dealing between the parties and trade usage in order to "supplement, qualify, and explain the meaning" of contract terms).

evidence, the jury may have concluded that the copyright infringements that McGraw-Hill contends were storm warnings reflected instead the normal course of business between McGraw-Hill, GHPI, and other stock photography agencies, such that these incidents would not have alerted a reasonably objective copyright holder to widespread license overruns at McGraw-Hill.

Fourth, there is also ample evidence in the record that when GHPI became aware of these instances of late licensing or overruns from McGraw-Hill, GHPI discussed the issue with McGraw-Hill, requested McGraw-Hill pay a penalty on numerous occasions, and resolved the issue. The jury may have concluded from this evidence that (i) GHPI did not sit on its rights by ignoring the copyright infringements of which it was aware, but instead pursued resolution of them, and (ii) GHPI may have treated past instances of copyright infringement it had resolved as closed matters, not as storm warnings of future instability.

Fifth, the jury may have concluded from evidence that McGraw-Hill regarded its print run information as confidential, that an objectively reasonable copyright holder, who was dependent on McGraw-Hill for information, could not be charged with inquiry notice. This case differs somewhat from the securities fraud context, in which investors are charged with the knowledge contained in the public statements and prospectuses that companies issue. For example, plaintiffs were held to have been aware of storm warnings in In re NAHC, that defendant had overstated the value of its long-term care services business, because defendants had made a series of public disclosures indicating that business was in trouble. In re NAHC, 306 F.3d at 1326. In Mathews, plaintiffs were held to have been aware of storm warnings that defendants fraudulently misrepresented securities as low-risk because the defendants provided numerous financial updates

34

that stated the securities were highly volatile.   Mathews, 260 F.3d at 253-54.   In this case, however, except for the occasions when McGraw-Hill came forward to admit infringements, the jury may have concluded that there were no public disclosures which would have tipped off a reasonably objective copyright holder that McGraw-Hill was committing large-scale copyright infringement by overrunning licenses.

The import of this evidence is significant.   Viewing this evidence in the light most favorable to GHPI, the evidence provides a basis for the jury's verdict.   Applying the objectively reasonable test to all the evidence presented, the Court must find that the jury could have validly concluded that McGraw-Hill did not meet its burden of showing that GHPI was aware or should have been aware of storm warnings before April 18, 2009.   Accordingly, although it is a very close question, the Court concludes that granting McGraw-Hill's motion for judgment as a matter of law and overturning the jury's verdict is not warranted because there is a legally sufficient evidentiary basis for the jury's verdict on the statute of limitations issue.

**E.  Interlocutory Appeal**

Because the statute of limitations question presents a discrete issue of law that is of upmost importance to the resolution of the numerous remaining claims that were not considered at the bellwether trial, the Court is considering certifying the question for interlocutory appeal to the Third Circuit under Federal Rule of Civil Procedure 1292(b).   The Court will provide each party with 14 days from the date of the attached Order to submit their positions as to whether certification for interlocutory appeal is warranted.

**V. Conclusion**

Because there was a legally sufficient evidentiary basis for the jury's finding that GHPI's claims accruing before April 18, 2009 were not time-barred under the discovery rule, the Court will deny McGraw-Hill's Rule 50(b) motion.

An appropriate Order follows.

O:\CIVIL 12\12-2061 grant v. mcgraw\12cv2061.memo.jmol.3.20.15.docx